T.C. Memo. 2011-61

UNITED STATES TAX COURT

DOUGLAS R. GRIFFIN, TRANSFEREE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13087-08.              Filed March 15, 2011.

<u>James R. Monroe</u> and <u>Albert B. Kerkhove</u>, for petitioner.

<u>Michael W. Bitner</u> and <u>Douglas S. Polsky</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

KROUPA, <u>Judge</u>:  Respondent determined that petitioner is liable as a transferee of HydroTemp Manufacturing Company, Inc. (HydroTemp) for a $2,207,171 income tax deficiency of HydroTemp plus penalties and interest for the tax year ending June 30, 2003 (the year at issue).  We must determine whether petitioner is

liable as a transferee under section 6901[1] for HydroTemp's unpaid Federal income tax liability.  We hold that he is not.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.  We incorporate the stipulation of facts and the accompanying exhibits by this reference.  Petitioner resided in Fort Myers, Florida at the time he filed the petition.

Petitioner is a lifelong entrepreneur.  He has started, owned and operated approximately 25 businesses in his career, some worth millions of dollars.  One of petitioner's most successful businesses was HydroTemp.  Petitioner and Ronald Myers (Mr. Myers) incorporated HydroTemp in the State of Florida in 1988.  HydroTemp's primary business was manufacturing, designing and distributing swimming pool heat pump equipment and hot water generators.  All operations took place in Florida.  Petitioner and Mr. Myers each owned 50 percent of HydroTemp stock until petitioner purchased Mr. Myers' interest to become the sole owner of HydroTemp in 1997.

HydroTemp became one of the largest swimming pool heat pump manufacturing businesses in the United States.  HydroTemp's success was largely based on its sales to Pentair Corporation

---

[1]All section references are to the Internal Revenue Code (the Code) in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

(Pentair), the largest pool heater manufacturer in the United States. Approximately half of HydroTemp's sales were to Pentair. Pentair inquired about purchasing HydroTemp's swimming pool heat pump business on numerous occasions. Petitioner was not interested in selling HydroTemp. He began to worry, however, that if he did not sell HydroTemp's swimming pool heat pump assets (heat pump assets) to Pentair, he would lose Pentair's business. This scenario would put HydroTemp in dire straits. After careful consideration, he decided to sell the heat pump assets to Pentair in late 2002.

Sale of Heat Pump Assets

HydroTemp and Pentair both performed extensive due diligence in preparing for the asset sale. HydroTemp's advisers on the transaction were Taso Milanos (Mr. Milanos), a corporate attorney, and Robert Hull (Mr. Hull), petitioner's CPA. Pentair and HydroTemp agreed to an $8.3 million sale price in exchange for HydroTemp's heat pump assets and the rights to the HydroTemp name brand, which was a well-known trademark in the industry. Both companies agreed that the sale would not involve any of HydroTemp's other assets.

HydroTemp and Pentair closed on the sale of the heat pump assets on January 30, 2003. Mr. Hull determined that HydroTemp's combined Federal and State corporate income tax liability from the asset sale was approximately $2.6 million. Mr. Milanos

prepared Articles of Amendment to Articles of Incorporation (Amended Articles) changing HydroTemp's name to HTMC Corporation, which were immediately executed following the sale of its heat pump assets.[2] Mr. Milanos inadvertently failed, however, to file the Amended Articles with the Florida Secretary of State until June 2003.

After selling its heat pump assets, HydroTemp retained manufacturing equipment, trucks, a webcam system, an automatic dialing system,[3] computers, office supplies and inventory unrelated to the heat pump assets. Moreover, it had approximately $1.5 million in accounts receivable. HydroTemp continued to employ five to ten employees to sell hot water generators and perform accounting work.

Petitioner deposited $8.3 million from the sale of the heat pump assets into HydroTemp's non-interest-bearing checking account at SunTrust Bank (SunTrust account). HydroTemp used

---

[2]We refer to both HydroTemp and HTMC Corporation as HydroTemp in this opinion.

[3]An automatic dialing system is an electronic device that can automatically dial a long list of phone numbers. Typically, the automatic dialer will dial a random phone number from the list and then transfer the call to a human operator if it detects that a live person has answered the phone. The device can also be programmed to play a recorded message, leave a message on an answering machine or provide a menu of options to the person who answers. Automatic dialing systems are most commonly associated with telemarketers, but they are also used by other businesses and entities including schools, to send alerts to parents, and doctors, to remind patients of appointments.

approximately $2 million from the sale proceeds to repay loans and award bonuses to employees. HydroTemp had approximately $6.4 million of the sale proceeds remaining in the SunTrust account. Petitioner wanted to transfer funds from the SunTrust account to an interest-bearing account so HydroTemp could earn interest on the money. He was unable, however, to open an account in HydroTemp's name because the name change documentation had yet to be certified by the Secretary of State. Petitioner determined that HydroTemp could earn interest on its funds if he had the corporation lend him $5 million to place in a Smith Barney interest-bearing account (Smith Barney account) in his name. The loan was evidenced by a $5 million promissory note from petitioner to HydroTemp with four percent annual interest payable on demand (petitioner's note). Petitioner intended only to hold the cash in the Smith Barney account until an interest-bearing account could be opened in HydroTemp's name. Petitioner therefore pledged to pay petitioner's note by the earlier of the date the Florida Secretary of State certified the name change or by the end of HydroTemp's tax year, which was June 30, 2003. This pledge ensured that the money would be repaid to HydroTemp within six months.

HydroTemp also transferred to petitioner an additional $300,000, which petitioner treated as an interest-free loan to

compensate him for past services. HydroTemp kept approximately $500,000 in cash in the SunTrust account.

MidCoast Stock Redemption Transaction

After the Pentair sale, petitioner received several calls from different individuals and businesses interested in helping HydroTemp invest the sale proceeds. Petitioner thought most of the offers were from fly-by-night operations and rejected them immediately. He also received inquiries from stock brokers, estate planners and others offering aggressive wealth-planning strategies, which he also rebuffed. One call petitioner received was from Don Stevenson (Mr. Stevenson), Executive Vice President for Acquisitions at MidCoast Investments, Inc. (MidCoast Investments). Mr. Stevenson informed petitioner that MidCoast Credit Corporation (MidCoast), the parent corporation of MidCoast Investments and other affiliates, was interested in acquiring HydroTemp. Mr. Stevenson told petitioner that MidCoast specialized in the asset recovery business and that MidCoast wanted to integrate HydroTemp into its business. Petitioner was initially a bit wary. This was unfamiliar territory for petitioner. He had no experience in selling corporate stock and no knowledge of the asset recovery business, and he was not acquainted with Mr. Stevenson or MidCoast.

Petitioner performed extensive due diligence. He spent a great deal of time learning about the asset recovery business and

MidCoast. He learned from Mr. Stevenson that MidCoast had acquired over 200 companies in its nearly 50-year existence. MidCoast's asset recovery business primarily consisted of buying formerly robust companies with delinquent accounts receivable, including credit card debt, and collecting and managing the debt. Mr. Stevenson told petitioner that MidCoast was specifically interested in purchasing all of HydroTemp's stock because of HydroTemp's cash, accounts receivable and residual assets, which, coupled with petitioner's note, totaled approximately $6.4 million. MidCoast made clear to petitioner that it wanted full control of HydroTemp and planned to use the residual assets, such as the automatic dialer, computers and webcam, to convert HydroTemp into an asset recovery business.

Mr. Stevenson's offer intrigued petitioner. Petitioner first contacted persons on MidCoast's reference list. He then visited MidCoast's office in Lake Worth, Florida to investigate the building, employees and overall ambience of the office. Petitioner was impressed that MidCoast occupied the penthouse suite of a newer office building and that the employees displayed a positive attitude. Petitioner and his advisers also pored through MidCoast's records, all of which supported Mr. Stevenson's assertions about MidCoast. Petitioner's extensive due diligence on MidCoast all came back positive. MidCoast presented petitioner with a Letter of Intent that stated the

purchase price for HydroTemp's stock would equal HydroTemp's cash, less 52 percent of HydroTemp's tax liability, plus $25,000 for reimbursement of expenses. After consulting with his advisers, petitioner decided to sign the Letter of Intent to sell his HydroTemp stock to MidCoast.

Petitioner began having second thoughts, however, almost as soon as he signed the Letter of Intent. Petitioner became annoyed with MidCoast's attorney, Olga Parra (Ms. Parra). Ms. Parra often showed up late for meetings and missed several major deadlines regarding the transaction's closing. MidCoast then exacerbated the situation by changing the payment from all cash to some cash and a promissory note in the final Stock Purchase Agreement and Stock Redemption Agreement in June 2003 (collectively, MidCoast stock redemption transaction). Under the MidCoast stock redemption transaction, HydroTemp would redeem 1,050 shares of petitioner's HydroTemp stock by extinguishing $3.8 million of the loan made by HydroTemp to petitioner, and petitioner would transfer all his remaining HydroTemp shares to MidCoast. Petitioner would still owe HydroTemp $1,407,710 to satisfy petitioner's note. In return, MidCoast would issue petitioner a $1,407,710 note (MidCoast note), which petitioner would then assign to HydroTemp to satisfy his outstanding balance. MidCoast would also pay petitioner $37,215 in cash and

satisfy any and all tax liabilities incurred by HydroTemp before MidCoast's stock purchase.

Petitioner's first reaction to the new terms was to revoke the Letter of Intent because of what he perceived to be unprofessional and unscrupulous behavior by MidCoast. Moreover, he thought MidCoast undervalued HydroTemp's stock by $100,000. He expressed his displeasure to a MidCoast executive, who threatened to sue petitioner if he did not complete the transaction. Petitioner's anxiety grew because he had no experience in these types of transactions. He immediately consulted with HydroTemp's attorney, John Coleman, and Mr. Hull on how best to move forward. Both advised petitioner to go forward with the MidCoast stock redemption transaction.

Petitioner relied on the recommendation of his trusted advisers and executed the MidCoast stock redemption transaction on June 13, 2003. MidCoast received 75 percent of the HydroTemp stock and MidCoast's related company, MidCoast Acquisitions, received the remaining 25 percent.

Petitioner repaid HydroTemp $200,000 of the compensation loan he had received from HydroTemp and treated the remaining $100,000 as income. HydroTemp's balance sheet showed assets of $2,635,399[4] and Federal and State tax liabilities totaling

---

[4]All monetary amounts are rounded to the nearest dollar.

$2,406,973, for an approximate $225,000 net equity following the MidCoast stock redemption transaction.

Petitioner and his wife reported $5,192,000 of capital gains from the HydroTemp stock sale and paid $777,216 in income tax with their joint Federal income tax return for 2003. Petitioner held no ownership interest in or authority over HydroTemp after the MidCoast stock redemption transaction.

HydroTemp's Tax Return for the Year at Issue

HydroTemp timely filed a return for the year at issue. HydroTemp reported a $7,524,153 long-term capital gain from the asset sale to Pentair and a $7 million short-term capital loss from the sale of binary options.[5] Rather than reporting the approximate $2.6 million tax liability from the Pentair sale, HydroTemp reported a total $508,322 loss with no Federal income tax due because of the short-term capital loss from the binary options. The return listed petitioner as the 100-percent stockholder of HydroTemp even though petitioner had no interest in or involvement with HydroTemp after June 13, 2003. Petitioner was in no way involved in preparing the return.

Respondent's Audit and Assessment of HydroTemp's Tax Liability

Respondent began an audit of HydroTemp's return for the year at issue in 2006. Respondent disallowed HydroTemp's losses from

---

[5]A binary option is a type of option in which the payoff is structured to be either a fixed amount of compensation if the option expires in the money or nothing at all if the option expires out of the money.

its claimed binary options sale and determined a deficiency in HydroTemp's income tax and a 40-percent accuracy-related penalty under section 6662(a) for failure to substantiate the losses. Respondent purports to have sent duplicate deficiency notices to HydroTemp at its last two known addresses provided by a MidCoast affiliate, one in New York and one in Bermuda, on February 7, 2007. HydroTemp did not respond to any deficiency notice. Respondent assessed HydroTemp's deficiency and penalty plus interest for a total of $3,878,294.

Revenue Officer Ted Hanson (Mr. Hanson) was assigned to collect on HydroTemp's assessment. Mr. Hanson could not find any HydroTemp assets to satisfy the tax liability and determined that HydroTemp could not pay the assessed amount. Mr. Hanson subsequently issued a Notice of Transferee Liability (transferee notice) to petitioner for the full tax liability in March 2008. The transferee notice stated that HydroTemp had transferred substantially all of its assets to petitioner following the asset sale to Pentair.

MidCoast's Liability for HydroTemp's Unpaid Taxes

Petitioner first discovered that HydroTemp failed to satisfy its tax liability for the year at issue when he received the transferee notice. Petitioner had no connection with HydroTemp after selling his entire share interest to MidCoast. He learned that MidCoast and MidCoast Acquisitions sold all of their

HydroTemp stock to Her Majesty's Cat, LLC (HMC) less than two weeks after the MidCoast stock redemption transaction. MidCoast continued to operate HydroTemp for HMC as an asset recovery business for approximately one year, but the State of Florida administratively dissolved HydroTemp in October 2004 for failing to file its annual report with the State.

Petitioner contacted MidCoast immediately after receiving the transferee notice and demanded that MidCoast honor its agreement to pay HydroTemp's tax liability. MidCoast refused to pay. Petitioner thereafter sought a declaratory judgment in Florida Circuit Court that MidCoast was liable to pay HydroTemp's taxes for the year at issue. The Florida Circuit Court agreed with petitioner that MidCoast was liable for HydroTemp's taxes and entered a decision against MidCoast. The Florida Circuit Court of Appeals affirmed the lower court's ruling when MidCoast appealed. Petitioner spent over $125,000 in attorney's fees to obtain the judgment against MidCoast. Despite these legal fees and judgments, MidCoast has not paid the taxes. Respondent seeks to collect HydroTemp's taxes from petitioner as a transferee.

Petitioner timely filed a petition with this Court contesting the transferee notice. At trial, respondent did not present a copy of either deficiency notice issued to HydroTemp for the year at issue but produced a certified mailing list as evidence that a deficiency notice had been issued.

OPINION

We must determine whether petitioner is liable as a transferee for HydroTemp's unpaid taxes for the year at issue. Petitioner contends that HydroTemp's transfers to him were not fraudulent under State law and therefore no transferee liability exists. Petitioner argues, alternatively, that respondent failed to issue HydroTemp a deficiency notice.

## I. Transferee Liability

We begin with the rules governing transferee liability. The Commissioner has a procedure to enforce and collect a transferor's unpaid taxes from a transferee. Sec. 6901. The Code does not, however, create or define substantive transferee liability. Instead, we must look to the law of the State in which the transfer occurred to determine the existence and extent of transferee liability. See Commissioner v. Stern, 357 U.S. 39, 45 (1958). The parties agree that Florida law governs because the transfers at issue were most closely connected with Florida. Respondent bears the burden of proving that petitioner is liable under Florida law as a transferee but not of proving HydroTemp's liability for the assessment of its tax. See sec. 6902(a); Rule 142(d).

A transferee may be liable under the Florida Uniform Fraudulent Transfer Act (UFTA) for the debts of a transferor who fraudulently conveys assets to the transferee. See Hagaman v.

Commissioner, 100 T.C. 180, 188 (1993); Schad v. Commissioner, 87
T.C. 609, 614 (1986), affd. without published opinion 827 F.2d
774 (11th Cir. 1987); Wiltzius v. Commissioner, T.C. Memo. 1997-
117.  In pertinent part, "transfer" means every disposition of or
parting with an asset or an interest in an asset and includes
payment of money, release, lease and creation of a lien or other
encumbrance.  Fla. Stat. Ann. sec. 726.102(12) (West 2000).
Accordingly, respondent must prove that there was a disposition
of property from HydroTemp to petitioner and that the disposition
was fraudulent.

A. <u>Transfers to Petitioner</u>

Here, we have two transfers to petitioner.  The first
transfer occurred when HydroTemp lent petitioner $5 million from
the sale proceeds of heat pump assets to Pentair in exchange for
petitioner's note (Pentair transaction).  The second transfer
occurred in the MidCoast stock redemption transaction when
HydroTemp canceled petitioner's note in exchange for a portion of
petitioner's HydroTemp shares and the MidCoast note.

Respondent asserts that the Pentair transaction followed by
the MidCoast stock redemption transaction were part of an
integrated plan known as an "intermediary transaction" entered
into by petitioner solely to lower his tax liability.[6]  See

---

[6]A transaction determined to be an intermediary transaction
will be treated as a listed transaction and thus require the tax
(continued...)

Notice 2001-16, 2001-1 C.B. 730.  Respondent urges the Court to collapse the two transactions.  Respondent argues that the one transaction consisted of HydroTemp's asset sale to Pentair followed by a liquidating distribution of the sale proceeds to petitioner.

Respondent asks that we use the substance over form judicial doctrine to collapse the two transfers.  Courts use substance over form and its related judicial doctrines to give true meaning to a transaction disguised by formalisms that exist solely to alter tax liabilities.  See United States v. R.F. Ball Constr. Co., 355 U.S. 587 (1958); Commissioner v. Court Holding Co., 324 U.S. 331 (1945); Volvo Cars of N. Am., LLC v. United States, 571 F.3d 373 (4th Cir. 2009); Rose v. Commissioner, T.C. Memo. 1973-207.  In such instances, the substance of a transaction, rather than its form, will be given effect.  We generally respect the form of a transaction, however, and will apply the substance over form principles only when warranted.  See Gregory v. Helvering, 293 U.S. 465 (1935); Blueberry Land Co. v. Commissioner, 361 F.2d 93, 100-101 (5th Cir. 1966), affg. 42 T.C. 1137 (1964).

Here, we find that substance over form and its related doctrines are not warranted.  The Pentair transaction and the MidCoast stock redemption transaction were not arranged in

[6](...continued)
shelter rules and penalties to apply.  See, e.g., secs. 6111, 6707A, 6662A.

conjunction with each other. They each had independent legal significance. Petitioner had no knowledge of MidCoast at the time HydroTemp sold its heat pump assets to Pentair, its major customer. Moreover, petitioner had no preconceived plan to sell his HydroTemp stock to anyone, much less MidCoast, when petitioner signed the note to HydroTemp in exchange for the Pentair sale proceeds. We also consider that HydroTemp had assets other than the heat pump assets. In fact, petitioner continued to operate HydroTemp following the Pentair transaction for approximately six months. It had employees, manufacturing equipment, trucks, a webcam system, an automatic dialing system, computers, office supplies and inventory unrelated to the heat pump assets. In addition, HydroTemp continued as a going concern for more than a year following the MidCoast stock redemption transaction.

Petitioner also took actions to ensure that the corporate taxes would be paid as part of the MidCoast stock redemption transaction. Specifically, petitioner negotiated and obtained a tax agreement and indemnity clause from MidCoast. He later litigated to have the tax agreement and indemnity clause enforced in Florida State court. We reject the application of any judicial doctrine in this case, and instead find that two separate and distinct transfers occurred. We now focus on

whether either of the two separate transactions was a fraudulent conveyance under Florida law.

B. Fraudulent Transfer

Respondent contends that, even if the transactions are considered separately, petitioner should be liable as transferee of HydroTemp because both transactions were fraudulent. Respondent can establish fraudulent transfer under Florida's UFTA by showing that the transfer was either actually or constructively fraudulent. See Fla. Stat. Ann. secs. 726.105 and 726.106 (West 2000). Respondent argues that petitioner is liable under both actual and constructive fraud provisions. We will consider both transfers under each fraudulent transfer provision.

1. Actual Fraudulent Transfer

A transfer is fraudulent as to a creditor under Florida law if the debtor made the transfer with the actual intent to hinder, delay or defraud the creditor. Id. sec. 726.105(1). Courts generally require several badges of fraud to be present to find a transfer fraudulent under State law. See, e.g. Veigle v. United States, 873 F. Supp. 623, 626-627 (M.D. Fla. 1994) affd. without published opinion sub nom. Ariko v. United States, 92 F.3d 1199 (11th Cir. 1996). Respondent ignores many of the badges that overtly favor petitioner. Instead, respondent contends that petitioner, an insider, transferred substantially all of HydroTemp's assets to himself, which caused HydroTemp to become

insolvent after HydroTemp incurred a substantial debt. See Fla. Stat. Ann. sec. 726.105(2). We shall consider this argument against both transactions.

We first look at the Pentair transaction. Petitioner concedes he was an insider of HydroTemp. This factor is not fatal, however, as the remaining badges favor petitioner, not respondent. We disagree with respondent's assertion that petitioner had possession of substantially all of HydroTemp's assets following the cash transfer. Respondent ignores the fact that HydroTemp received petitioner's note in exchange for the cash. Moreover, HydroTemp controlled the cash because petitioner's note was payable on demand. See Litton Bus. Sys., Inc. v. Commissioner, 61 T.C. 367, 378 (1973). In addition, respondent has not shown that petitioner had insufficient assets to cover petitioner's note. In fact, petitioner could have repaid the loan if HydroTemp had demanded repayment. The funds were readily available in the Smith Barney account. HydroTemp also had assets other than petitioner's note. HydroTemp maintained business assets, employees and over $500,000 of cash in its SunTrust account after the Pentair transaction. The non-heat-pump assets were viable, and HydroTemp continued as a going concern for approximately a year and a half after the $5 million transfer to petitioner.

We also disagree with respondent that HydroTemp was insolvent following the transfer.  A debtor is insolvent under Florida law if either the debtor's debts exceed the fair market value of the debtor's assets or the debtor fails to pay his or her debts as they become due.  Fla. Stat. Ann. sec. 726.103(2) (West 2000).  Respondent has not shown the Court that HydroTemp's debts exceeded the fair market value of HydroTemp's assets, including petitioner's note, nor has respondent proven that HydroTemp failed to pay its debts when they became due.  Accordingly, we cannot find that HydroTemp was insolvent following the Pentair transaction.

We next consider the second transfer, the MidCoast stock redemption transaction.  Petitioner again concedes he was an insider but argues the remaining badges of fraud are not present.  HydroTemp's equipment, accounts receivable, outstanding debt receivables and cash totaled approximately $6.4 million before the MidCoast stock redemption transaction.  Following the MidCoast stock redemption transaction, HydroTemp had approximately $1.2 million in cash, the MidCoast note for $1,407,410 and the indemnity agreement whereby MidCoast agreed to satisfy HydroTemp's substantial tax liability.  Respondent failed to present evidence assigning a different value to these assets.  Thus, HydroTemp retained approximately 40 percent of its total asset value plus the benefits of the MidCoast tax agreement

following the transaction.  Accordingly, we find that HydroTemp did not transfer substantially all of its assets to petitioner in connection with the MidCoast stock redemption transaction.

HydroTemp's only significant liability after the MidCoast stock redemption transaction was its $2,406,973 of Federal and State tax liabilities.  MidCoast was legally and contractually liable to satisfy these tax liabilities.  Furthermore, even if we were to discount the indemnity, respondent has not presented evidence demonstrating that HydroTemp's tax debts exceeded HydroTemp's cash, its business assets and the MidCoast note.  Accordingly, we find that HydroTemp was not insolvent following the transfer.

We have considered the badges of fraud raised by respondent against the Pentair transaction and the MidCoast stock redemption transaction.  We find that neither transfer was actually fraudulent.

### 2. Constructive Fraudulent Transfer

Respondent may also establish transferee liability by showing that a conveyance is constructively fraudulent.  See Fla. Stat. Ann. sec. 726.106.  As pertinent here, a transfer is constructively fraudulent if the debtor does not receive reasonably equivalent value and the debtor was insolvent or became insolvent as a result of the transfer.  Id. sec. 726.106(1).

We find that neither the Pentair transaction nor the MidCoast stock redemption transaction was constructively fraudulent. As to the Pentair transaction, HydroTemp was not insolvent before or after the transfer of cash to petitioner in exchange for petitioner's note. Respondent has failed to prove that petitioner's note was not of reasonably equivalent value to the sale proceeds transferred to the Smith Barney account. Nor has respondent shown that petitioner's assets were insufficient to pay petitioner's note if he was called upon.

Likewise, respondent failed to show that HydroTemp was insolvent before or after it canceled petitioner's note in exchange for the HydroTemp stock and the MidCoast note. Respondent also has failed to prove that the MidCoast note and the HydroTemp stock were not of reasonably equivalent value to petitioner's note. We find that neither transfer was constructively fraudulent.

Accordingly we find that petitioner is not liable as a transferee for HydroTemp's unpaid taxes.

II. Limitations Period

Petitioner also challenges whether respondent timely issued a deficiency notice to HydroTemp. We need not decide this issue as we have already determined that petitioner is not liable as a transferee.

We have considered all arguments made in reaching our decision, and, to the extent not mentioned, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered for petitioner</u>.