T.C. Memo. 2012-57

UNITED STATES TAX COURT

NORMA L. SLONE, TRANSFEREE, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 6629-10, 6630-10,          Filed March 1, 2012.
6631-10, 6632-10.

<u>Stephen Edward Silver</u>, <u>David R. Jojola</u>, and <u>Jason M. Silver</u>, for

petitioners.

<u>John Wayne Duncan</u> and <u>Charles B. Burnett</u>, for respondent.

---

[1]Cases of the following petitioners are consolidated herewith:  Slone Family
GST Trust, UA Dated August 6, 1998, Transferee, D. Jack Roberts, Trustee, docket
No. 6630-10; James C. Slone, Transferee, docket No. 6631-10; and Slone
Revocable Trust, UA Dated September 20, 1994, Transferee, James C. Slone and
Norma L. Slone, Trustees, docket No. 6632-10.

MEMORANDUM FINDINGS OF FACT AND OPINION

HAINES, <u>Judge</u>:  This case arises from petitions for judicial review filed in response to notices of transferee liability issued to petitioners (transferee notices). The issues for decision are:  (1) whether the period of limitations for assessment expired before the mailing of the transferee notices to petitioners; (2) whether the substance over form doctrine applies to recast the transactions at issue; and (3) if so, whether petitioners are liable as transferees under section 6901 for Arizona Media Holding, Inc.'s (Arizona Media) unpaid Federal income tax liability for the tax year ended June 30, 2002.[2]

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.  The stipulations of fact, together with the attached exhibits, are incorporated herein by this reference. At the time petitioners filed their petitions, they resided in Arizona.

I.    <u>The Slone Family and Slone Broadcasting Co.</u>

Petitioner James C. Slone began his career in the radio industry in 1955.  In 1963 Mr. Slone became a disc jockey at KHOS, a local radio station in Tucson,

---

[2]All section references are to the Internal Revenue Code, as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure.  Amounts are roundest to the nearest dollar.

Arizona. Mr. Slone worked his way up to general manager of KHOS and served in that position until 1971, when he was offered the opportunity to take over as the manager of KCUB, another Tucson radio station. KCUB was owned and operated by Rex Broadcasting Co. (Rex Broadcasting), an Arizona corporation formed in 1968. Mr. Slone accepted the KCUB offer. As part of his agreement with KCUB, Mr. Slone became a partial owner of Rex Broadcasting.

Over time, Mr. Slone and his wife, petitioner Norma L. Slone, acquired all the outstanding shares of Rex Broadcasting. In 1998, Mr. Slone changed Rex Broadcasting's name to Slone Broadcasting Co. (Slone Broadcasting). In 2001 and 2002 Slone Broadcasting was a C corporation with a tax year ending June 30.

Slone Broadcasting was a family-run business, operating several radio stations in Tucson. In 2000 and 2001 Mr. Slone was Slone Broadcasting's president; his son James was its general manager, vice president and secretary; his son Fred was its national sales manager; and his daughter Mary was its treasurer as well as an on-air personality. Mrs. Slone did not work for Slone Broadcasting.

In 2001 Slone Broadcasting had two shareholders: (1) the Slone Revocable Trust, which owned 114,956 shares of class A voting stock and 951,834 shares of class B nonvoting stock; and (2) the Slone Family GST Trust (Slone GST Trust), which owned 82,770 shares of class B nonvoting stock. Both trusts were formed

pursuant to the laws of Arizona. Mr. and Mrs. Slone were the trustees of the revocable trust and the grantors of the Slone GST Trust, an irrevocable trust.

John Barkley was the sole trustee of the Slone GST Trust from its inception in 1998 throughout the time of the transactions at issue. He is a licensed fiduciary in the State of Arizona and is authorized to serve in various capacities, including personal representative, conservator and trustee. He hires accountants, lawyers, stockbrokers, and other professionals to aid him in carrying out his duties which are defined, in this case, by the documents that established the Slone GST Trust. He exercises his authority independently from Mr. and Mrs. Slone.

II.    The Asset Sale

In 2000, after consulting with his family, Mr. Slone decided to sell the Slone Broadcasting business. He believed that a small family-run business faced difficult challenges competing against larger companies. One of those larger companies was Citadel Broadcasting Co. (Citadel) owned by Larry Wilson. Mr. Wilson had previously shown an interest in buying Slone Broadcasting's radio stations and, when approached, indicated a continued interest in the acquisition.

The ensuing negotiations with Citadel were handled by a media broker consultant hired by Slone Broadcasting. Mr. Slone's accountant, D. Jack Roberts, a certified public accountant with over 30 years of experience, advised on the

accounting aspects of the transaction, and Tom Chandler, Slone Broadcasting's attorney, advised on the legal aspects of the transaction. None of the advisers proposed tax strategies to reduce the Federal and State income taxes resulting from the sale.

On December 21, 2000, Slone Broadcasting entered into an asset sale agreement with Citadel (the asset sale). The asset sale closed six months later on July 2, 2001. The purchase price was $45 million for all the assets of the radio stations owned and operated by Slone Broadcasting. Slone Broadcasting's adjusted basis in the assets sold totaled $6,401,074, resulting in a gain from the sale of $38,598,926 and an estimated combined Federal and State income tax liability of approximately $15,314,000.

The sale documents excluded the name "Slone Broadcasting" from the assets sold. Slone Broadcasting and Mr. Slone were not prohibited from reentering the media market by a noncompetition agreement. During negotiations with Citadel, Mr. Slone wanted to withdraw one of the radio stations from the sale so that he and his family could maintain a presence in the Tucson radio market. Citadel would not agree to the change. Therefore, after the closing of the asset sale, Slone

Broadcasting did not conduct any business.[3]  There were no plans to liquidate the corporation at any time, nor were there any plans to make distributions to its shareholders.  In fact, no distributions were made.  On October 15, 2001, Slone Broadcasting made its first estimated Federal income tax payment of $3,100,000 to the Internal Revenue Service (IRS) for its tax year ended June 30, 2002.

III.    The Stock Sale

Helen Johnson, a representative of Fortrend International, LLC (Fortrend), sent an unsolicited letter and brochure to Mr. Roberts on June 29, 2001.  Ms. Johnson's letter described Fortrend as a "private investment/merchant-banking group" seeking opportunities to acquire corporations in situations where the "assets of the Target Corporation can be profitably sold and/or leased to one or more purchasers/lessees."  The letter also stated that Fortrend was able to "structure transactions that help manage or resolve liabilities at the corporate level."  Mr. Roberts did not review the letter and company brochure until after the closing of the asset sale.

---

[3]The Slone family did not conduct any business in the radio industry again until 2006, when Mr. and Mrs. Slone purchased KEVT, a Tuscon radio station, through a related limited liability company.

On August 8, 2001, Ms. Johnson sent Mr. Roberts a second letter expressing Fortrend's continued interest in purchasing Slone Broadcasting's stock. It described Fortrend's relationship with Midcoast Credit Corp. (Midcoast), a corporation engaged in the business of collecting delinquent credit card debt acquired from banks. After receiving the second letter, Mr. Roberts informed Mr. Slone, in general, about Fortrend and Midcoast and the proposal to buy Slone Broadcasting's stock. Mr. Slone gave Mr. Roberts permission to investigate further and to proceed if the transaction looked viable.

On September 7, 2001, Ms. Johnson sent a third letter to Mr. Roberts, attaching the Fortrend/MidCoast business plan together with financial projections. The plan described a typical stock sale and subsequent business model as follows:

- An acquisition company ("AC") purchases stock of target corporation (the "Company") that is a C corporation;

- The Company has sold some or all of its assets;

- The Company engages MidCoast to re-engineer its operations into the asset recovery business, i.e. purchasing and collecting receivables;

- A significant portion of the proceeds received from the asset sale remains in the Company and is used by the Company to re-engineer its operations into the asset recovery business;

- The Company will reinvest the cash flows into additional purchases of receivables;

- The Company will sign a management contract with MidCoast for MidCoast to perform services for the Company.

Mr. Roberts hired Steven Phillips, a local tax attorney, as counsel to advise Mr. and Mrs. Slone and the Slone Revocable Trust on any Fortrend proposals. Mr. Phillips was not involved in and did not provide any legal advice with respect to the asset sale. On September 10, 2001, Mr. Phillips met with Mr. Slone to discuss the proposed transaction. This meeting was Mr. Slone's only contact with Mr. Phillips. Mr. Roberts represented Mr. Slone in all other communications with Mr. Phillips.

Mr. Roberts provided the Fortrend/MidCoast business plan to Mr. Phillips for review. Mr. Phillips contacted a broker in the asset recovery business to inquire about MidCoast's reputation. The broker informed Mr. Phillips that MidCoast played an active role in the asset recovery industry and had a reputation as an aggressive collector, but a legitimate one. Mr. Phillips reviewed the projections in the Fortrend/MidCoast business plan and concluded that they were reasonable. The reputations of Fortrend and Midcoast together with those of their attorneys and accountant advisers were good. There was no reason for Mr. Roberts or Mr. Phillips to suspect any impropriety.

On October 24, 2001, Fortrend sent Mr. Roberts a letter of intent to purchase Slone Broadcasting's stock through an affiliate, Berlinetta, Inc. (Berlinetta). Berlinetta's sole shareholder was Willow Investment Trust (Willow), a Fortrend entity. The letter of intent proposed a purchase price of $29,800,000 plus the assumption of Slone Broadcasting's Federal and State income taxes owed as of the closing date. Slone Broadcasting's balance sheet showed:

Assets:

| | |
|---|---:|
| Cash and cash equivalents | $35,764,147 |
| Due from related parties | 2,052,961 |
| Income tax refunds receivable | 175,466 |
| Prepaid income taxes | 3,800,000 |
| Total | 41,792,574 |

Liabilities and stockholder's equity:

| | |
|---|---:|
| Income taxes payable | $15,004,269 |
| Stockholder's equity | |
| Class A voting common stock | 114,956 |
| Class B nonvoting common stock | 26,673,349 |
| Total | 41,792,574 |

Mr. Roberts and Mr. Phillips knew that Fortrend had a strategy to reduce the income tax due as a result of the asset sale. When they asked Fortrend what actions Berlinetta would take to achieve the tax savings, they were told that Fortrend's methods could not be disclosed because they were "proprietary". However,

Fortrend represented that Berlinetta had not engaged in any transaction that would be deemed a "listed transaction" pursuant to Notice 2001-51, 2001-2 C.B. 190. Mr. Phillips negotiated an increase in the purchase price for the stock based upon what he described as a "premium" payment resulting from the tax savings anticipated by Berlinetta. When negotiations concluded, the parties agreed to a purchase price of $35,753,000 plus Berlinetta's assumption of Slone Broadcasting's Federal and State income taxes owed as of the closing date.

As trustee of the Slone GST Trust, Mr. Barkley hired Greg Gadarian, another local tax attorney independent from Mr. Phillips, to advise the Slone GST Trust with respect to any Fortrend proposals. On November 21, 2001, Mr. Phillips wrote a memorandum describing the transaction to Mr. Gadarian, providing a legal analysis of the transferee liability considerations facing Slone Broadcasting's shareholders, and concluding that they would not be exposed to such liability. Mr. Gadarian reviewed Mr. Phillips' memorandum and performed his own research. Mr. Gadarian agreed with Mr. Phillips' conclusions. Mr. Gadarian had no reason to think that Fortrend planned to use an illegitimate scheme to offset the gains from the asset sale. He therefore orally advised Mr. Barkley that there were no material legal obstacles to the proposed transaction. Soon after, Mr. Barkley approved the transaction on behalf of the Slone GST Trust. Both Mr. Phillips and Mr. Gadarian

were aware of Notice 2001-16, 2001-1 C.B. 730, and both concluded that it did not apply. On December 3, 2001, Mr. Phillips informed Mr. Roberts that there were no legal obstacles to proceeding. Mr. Roberts advised Mr. Slone that both Mr. Phillips and Mr. Gadarian had analyzed the legal implications of the transaction and concluded that it could proceed.

On December 10, 2001, Slone Broadcasting entered into the stock sale agreement with Berlinetta (stock sale). Berlinetta financed the acquisition of the stock through a combination of loans and equity. Utrecht-America Finance Co., the U.S. branch of Cooperative Centrale Raiffeisen-Boerenleenbank B.A. (Rabobank), lent Berlinetta $30 million, to be paid back no later than December 30, 2001. Slone Broadcasting had no involvement in the financing. The stock sale agreement placed a restriction on the use of funds held in Slone Broadcasting's bank account until 10 days after the closing date. Berlinetta also held at least $18,459,360 of equity at the time of closing.

At the closing the Slone Revocable Trust and Slone GST Trust received $30,819,544 and $2,550,456 in cash, respectively. Mr. Slone and his children resigned as the officers and directors of Slone Broadcasting. Slone Broadcasting did not make any distributions to its shareholders between the closing date of the asset sale and the closing date of the stock sale.

On their joint Form 1040, U.S. Individual Income Tax Return, Mr. and Mrs. Slone reported a basis in their Slone Broadcasting stock of $106,679, resulting in a reported gain from the stock sale of $32,765,826.[4] The Slone GST Trust filed a Form 1041, U.S. Income Tax Return for Estates and Trusts, for 2001, reporting a basis of $8,277 in its Slone Broadcasting stock and a gain from the stock sale of $2,542,179. Because the Slone GST Trust was deemed a grantor trust, see secs. 671-678, its income and expenses, including the gain from the stock sale, were reported on the 2001 joint Federal income tax return of its grantors, Mr. and Mrs. Slone.

IV.   Arizona Media

Two days after the closing of the stock sale, on December 12, 2001, Slone Broadcasting merged with Berlinetta, with Slone Broadcasting as the surviving corporation. Because the name "Slone Broadcasting" was not part of the sale, on January 17, 2002, Slone Broadcasting changed its name to Arizona Media.[5]

---

[4]For Federal income tax purposes, the Slone Revocable Trust is a disregarded entity, and it did not file a Federal tax return.

[5]For simplicity, although the name change did not occur until January 17, 2002, we will refer to the surviving corporation as Arizona Media at all times after the closing of the stock purchase agreement.

On December 13, 2001, Willow contributed Treasury bills to Arizona Media with a purported basis of $38,148,304, and on January 7, 2002, Arizona Media sold the Treasury bills for $108,731. On July 7, 2002, Arizona Media filed its Federal tax return for its tax year ended June 30, 2002, reporting a $37,885,260 gain from the asset sale and an offsetting loss of $38,039,573 from the sale of the Treasury bills. On August 6, 2002, the IRS refunded Arizona Media the $3,100,000 estimated tax payment previously made by Slone Broadcasting.

The IRS began its examination of Arizona Media in March 2005. The president of Arizona Media at the time was Tim Conn, who was identified as the corporation's president, secretary, and treasurer in its annual report filed with the Arizona Corporation Commission. Arizona Media's bylaws prohibited the same person from simultaneously serving as both president and treasurer of the corporation.

On March 10, 2005, Arizona Media submitted to the IRS a Form 872, Consent to Extend the Time to Assess Tax, for its tax year ending June 30, 2002, signed by Mr. Conn, agreeing to extend the period of limitations for assessment to December 31, 2006. On March 15, 2005, Arizona Media provided the IRS with a Form 2848, Power of Attorney and Declaration of Representative, signed by Mr. Conn, authorizing Arizona Media's attorney, Randall Dick, to execute further

extensions on Arizona Media's behalf. Over the next three years, Mr. Dick signed additional Forms 872, agreeing to extend the period of limitations for assessment of Arizona Media for the taxable year ended June 30, 2002. The final extension was authorized on September 17, 2007, and extended the period of limitations for assessment to December 31, 2008. On April 14, 2008, Arizona Media submitted Form 870-AD, Offer to Waive Restrictions on Assessment and Collection of Tax Deficiency and to Accept Overassessment, to the IRS, accepting a deficiency in income tax of $13,494,884 and a penalty pursuant to section 6662 of $2,698,997. The IRS assessed the tax and the penalty on May 30, 2008, together with interest of $7,277,395.

Arizona Media failed to pay the assessed tax, penalty, and interest. As a result, on October 20, 2008, the IRS placed Arizona Media's account on the Federal Payment Levy Program. On December 5, 2008, the IRS issued a notice of intent to levy, a due process notice, and a levy notice (notice of levy) to Arizona Media, and on December 12, 2008, filed a notice of Federal tax lien for Arizona Media's taxable year ended June 30, 2002. The IRS issued further notices of levy to Arizona Media on February 10, August 4 and September 9, 2009. No moneys were ever collected from Arizona Media. On August 28, 2009, Arizona Media was

administratively dissolved for failure to file its annual report with the State of Arizona.

## V. Transferee Notice

On December 22, 2009, respondent issued transferee notices to the Slone Revocable Trust and Slone GST Trust, determining that the trusts were liable for $16,193,881 and $2,550,832, respectively, plus interest, as transferees of assets for the unpaid liability of Arizona Media for the tax year ended June 30, 2002. Additionally, respondent issued separate transferee notices to Mr. and Mrs. Slone individually, determining each liable under a transferee theory for $16,193,881, plus interest, for the unpaid liability of Arizona Media. Petitioners timely filed their petitions.

## OPINION

## I. Section 6901

Section 6901(a)(1) is a procedural statute authorizing the assessment of transferee liability in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the transferee liability is incurred. Section 6901(a) does not independently impose tax liability upon a transferee but provides a procedure through which the Commissioner may collect from a transferee unpaid taxes owed by the transferor of the assets if an independent

basis exists under applicable State law or State equity principles for holding the transferee liable for the transferor's debts. Commissioner v. Stern, 357 U.S. 39, 42-47 (1958); Hagaman v. Commissioner, 100 T.C. 180, 183 (1993); Starnes v. Commissioner, T.C. Memo. 2011-63. Thus, State law determines the elements of liability, and section 6901 provides the remedy or procedure to be employed by the Commissioner as the means of enforcing that liability. Ginsberg v. Commissioner, 305 F.2d 664, 667 (2d Cir. 1962), aff'g 35 T.C. 1148 (1961). Section 6902(a) and Rule 142(d) provide that the Commissioner has the burden of proving the taxpayer's liability as a transferee but not of showing that the transferor was liable for the tax.

II.    Period of Limitations

Petitioners argue that the deficiency and the penalty determined against Arizona Media for the tax year ended June 30, 2002, were not timely assessed and, therefore, respondent is time barred by the period of limitations under section 6901 from assessing transferee liability against petitioners. Section 6501(a) provides, generally, that the amount of any tax must be assessed within three years of the filing of a return. The period of limitations for assessment of a liability against an initial transferee is one year after the expiration of the period of limitations for assessment against the transferor. Sec. 6901(c)(1). For a transferee of a transferee,

section 6901(c)(2) provides that the period of limitations expires one year after the expiration of the period of limitations for assessment against the previous transferee, but not more than three years after the expiration of the period of limitations against the initial transferor.

Section 6501(c)(4) allows for extension of the period of limitations for assessment by agreement of the taxpayer and the Secretary. Arizona Media's Federal income tax return was deemed filed on September 15, 2002, creating a September 15, 2005, deadline for assessment pursuant to section 6501(a).[6] On March 10, 2005, Arizona Media submitted a Form 872 to the IRS, signed by Mr. Conn as president, extending the period for assessment to December 31, 2006. Further extensions were filed by Mr. Dick pursuant to a power of attorney, the last of which extended the assessment period for tax year ended June 30, 2002, to December 31, 2008. Respondent assessed the deficiency and penalty in this case on May 30, 2008.

Respondent contends that because Arizona Media agreed to extend its period of limitations for assessment to December 31, 2008, the period of limitations for

_____

[6]Arizona Media filed its Federal tax return for its tax year ended June 30, 2002, on July 7, 2002. Nonetheless, a return is considered filed on the last day prescribed for filing if it is filed before that day. Sec. 6501(b)(1). September 15, 2002, was the last day prescribed for Arizona Media to file. See sec. 6072(b).

assessment against an initial transferee of Arizona Media was extended to December 31, 2009. See sec. 6901(c)(1). The transferee notices were sent to petitioners on December 22, 2009.

Petitioners argue that Arizona Media's extension consents were not signed by authorized officers of Arizona Media and, therefore, were invalid. More specifically, petitioners argue that Mr. Conn did not have the authority to sign the original Form 872, extending the period of limitations for Arizona Media to December 31, 2006, and did not have the authority to sign the power of attorney granting Mr. Dick the right to authorize subsequent extensions. As a result, petitioners argue that the transferee notices were issued outside the period of limitations.

Section 6062 provides that corporate returns may be signed by "the president, vice-president, treasurer, assistant treasurer, chief accounting officer or any other officer duly authorized so to act." Rev. Rul. 83-41, 1983-1 C.B. 349, provides that the IRS will generally apply the same rules to a consent to extend the period of limitations. When Mr. Conn signed the original Form 872 and the power of attorney granting Mr. Dick the authority to sign future extensions, he served as both the president and the treasurer of Arizona Media. Petitioners argue that because Arizona Media's bylaws prohibit the same person from simultaneously

holding both positions, Mr. Conn was neither the president nor the treasurer of Arizona Media and had no authority to sign the documents at issue.

Petitioners rely on Arizona law to support this argument. Ariz. Rev. Stat. Ann. (A.R.S.) sec. 10-840 (2004) provides that the board of directors of a corporation shall appoint officers in accordance with its bylaws. A.R.S. sec. 10-841 (2004) also provides that each officer of an Arizona corporation must perform his or her duties in accordance with the bylaws.

Petitioners' argument is not persuasive. We do not need to determine whether Mr. Conn had actual authority to sign the documents at issue because even if he did not, he had ostensible authority. Under Arizona law, ostensible authority is that authority which exists where the principal knowingly or negligently holds his agent out as possessing it, or permits him to assume it, under such circumstances as to estop the principal from denying its existence. Koven v. Saberdyne Sys., Inc., 625 P.2d 907, 911 (Ariz. Ct. App. 1980). To establish ostensible authority, the record must reflect not only that the alleged principal held out another as his agent, but also that the person who relied upon the manifestation was reasonably justified in doing so under the facts of the case. Id. at 912.

In Koven, the court held that an annual report submitted to the Arizona Corporation Commission granted the listed vice president of the corporation the

ostensible authority to receive service of process. In the instant case, Arizona Media's annual report filed with the Arizona Corporation Commission identified Mr. Conn as the corporation's president, secretary, and treasurer. Similar to the report in Koven, this filing gave Mr. Conn the ostensible authority to sign the documents at issue on behalf of Arizona Media.

Section 1.6062-1(c), Income Tax Regs., provides that an individual's signature on a return, statement, or other document made by or for a corporation is prima facie evidence that the individual is authorized to sign the return, statement, or other document. Petitioners have not presented any facts suggesting that the IRS had reason to suspect that Mr. Conn did not have the authority to sign the documents at issue. Therefore, the IRS determination that Mr. Conn had the authority to sign the documents at issue was reasonably justified. The period of limitations for assessment with respect to Arizona Media was validly extended to December 31, 2008, and the transferee notices were not time barred.

III. Theory of the Case

Respondent's theory of the case has changed from the pleadings to his briefs. The transferee notices state that the stock sale should not be respected for Federal tax purposes because it is substantially similar to an "intermediary transaction" tax shelter described in Notice 2001-16, supra. Under that notice, respondent sought to

collapse the asset sale and the stock sale to recharacterize the transactions as an asset sale followed by a liquidating distribution. Respondent abandoned this argument on brief and acknowledged that the asset sale was independent from the stock sale. Respondent now argues the substance over form doctrine to recast the stock sale alone as a liquidating distribution.[7] Respondent has further conceded that petitioners' transferee liability under section 6901 relies on his underlying substance over form argument.[8] Therefore, if we determine that the stock sale must be respected for Federal tax purposes, respondent's concession resolves the transferee liability issue in favor of petitioners.

IV. Substance Over Form Doctrine

Courts use substance over form and its related judicial doctrines to determine the true meaning of a transaction disguised by formalisms that exist solely to alter

---

[7]Respondent also argued that the stock sale should be disregarded for Federal tax purposes pursuant to the economic substance doctrine. Respondent presented this argument for the first time at trial and on brief. We do not find this argument to be timely, and, therefore, we will not consider its applicability. See, e.g., Estate of Mandels v. Commissioner, 64 T.C. 61 (1975); Estate of Horvath v. Commissioner, 59 T.C. 551, 556 (1973); Frentz v. Commissioner, 44 T.C. 485, 490-491 (1965), aff'd per order, 375 F.2d 662 (6th Cir. 1967) ("This Court has held on numerous occasions that it will not consider issues which have not been pleaded.").

[8]Respondent states that his transferee liability theory is "predicated" on the underlying substance over form argument. Pretrial Mem. 19; Opening Br. 64; Reply Br. 82.

tax liabilities.  See United States v. R.F. Ball Constr. Co., 355 U.S. 587 (1958); Commissioner v. Court Holding Co., 324 U.S. 331 (1945); Stewart v. Commissioner, 714 F.2d 977, 987-988 (9th. Cir. 1983), aff'g T.C. Memo. 1982-209; Rose v. Commissioner, T.C. Memo. 1973-207.  In such instances, the substance of a transaction, rather than its form, will be given effect.  We generally respect the form of a transaction, however, and will apply the substance over form principles only when warranted.  See Gregory v. Helvering, 293 U.S. 465 (1935); Blueberry Land Co. v. Commissioner, 361 F.2d 93, 100-101 (5th Cir. 1966), aff'g 42 T.C. 1137 (1964).

We will respect the form of the transactions in this case.   Respondent has conceded that the asset sale was independent from the stock sale.  The asset sale was negotiated by a media broker with Mr. Roberts providing accounting advice and Mr. Chandler legal advice.  Mr. Roberts credibly testified that no tax strategies to offset the potential gain arising from the asset sale were discussed before the closing of the asset sale.  The asset sale closed on July 2, 2001, more than five months before the closing of the stock sale.  Slone Broadcasting's first installment of $3,100,000 of Federal income tax attributable to the asset sale was paid.  There is no evidence that Fortrend, Midcoast, or Berlinetta was involved in any way in the

asset sale, nor is there any evidence that a sale of stock was anticipated at the time that the asset sale was negotiated and closed.

With respect to the stock sale, Fortrend initiated contact with Slone Broadcasting after the closing of the asset sale. Mr. Roberts credibly testified that a letter addressed to him from Fortrend dated June 29, 2001, was not reviewed before the closing of the asset sale. Attorneys having no involvement in the asset sale were retained to negotiate the stock sale: Mr. Phillips for Mr. and Mrs. Slone and the Slone Revocable Trust, and Mr. Gadarian for the Slone GST Trust. Due diligence confirmed that Midcoast was a legitimate player in the debt collection industry and Fortrend and MidCoast had reputable law and accounting firms representing them. The purchaser of the stock, Berlinetta, was capable of closing by using funds provided by loans from Rabobank and other assets it owned. Berlinetta agreed that it would not use the assets of Slone Broadcasting for 10 days after the closing of the stock sale.

Respondent contends that petitioners, through their representatives, knew that Fortrend planned to offset the gain from the asset sale and that the offset was the reason the stock sale made financial sense to Fortrend. In fact, in Mr. Phillips' memo to Mr. Gadarian dated November 21, 2001, he explains Fortrend's plan to offset the gains from the asset sale by contributing high basis/low value assets to

Berlinetta in a section 351 transaction and selling those assets at a loss before the end of 2001. Respondent argues that this was enough information for petitioners to know of Fortrend's illegitimate scheme. We disagree.

We have addressed this argument in <u>Frank Sawyer Trust of May 1992 v. Commissioner</u>, T.C. Memo. 2011-298, another transferee liability case involving Fortrend, where we stated:

> Had the * * * [taxpayer] known of Fortrend's illegitimate scheme to fraudulently offset the tax liabilities of the corporations, then we would be inclined to disregard the form of the stock sales in favor of respondent's contentions. However, there are legitimate tax planning strategies to defer or avoid paying taxes, so it was not unreasonable for the * * * [taxpayer] to believe that Fortrend had a legitimate method of doing so.

Petitioners had no reason to believe that Fortrend's methods were illegal or inappropriate. When Mr. Roberts and Mr. Phillips asked Fortrend for more information about how Berlinetta planned to offset the gains from the asset sale, they were told that Fortrend's methods were "proprietary". Petitioners did not have a duty to inquire further and are not responsible for any tax strategies Berlinetta used after the closing of the stock sale.

Neither the substance over form doctrine nor any related doctrines apply to recast the stock sale as a liquidating distribution. Therefore, we find that the stock sale should be respected for Federal tax purposes.[9]

Respondent has conceded that his theory of transferee liability is predicated on his underlying substance over form argument with respect to the stock sale. Because we have determined that the stock sale must be respected for Federal tax purposes, respondent's concession resolves the transferee liability issue in favor of petitioners and we need not analyze that liability under State law.

The Court, in reaching its holdings, has considered all arguments made, and, to the extent not mentioned, concludes that they are moot, irrelevant, or without merit.

---

[9]This Court has decided a series of transferee liability cases stemming from transactions involving Fortrend and/or MidCoast. See Frank Sawyer Trust of May 1992 v. Commissioner, T.C. Memo. 2011-298; Feldman v. Commissioner, T.C. Memo. 2011-297; Starnes v. Commissioner, T.C. Memo. 2011-63; Griffin v. Commissioner, T.C. Memo. 2011-61; CHC Indus., Inc. v. Commissioner, T.C. Memo. 2011-33; LR Dev. Co., LLC v. Commissioner, T.C. Memo. 2010-203. Of these cases, Feldman and CHC are the only cases where we held against the taxpayer. Feldman is factually distinguishable from the instant case. First, in Feldman the taxpayer knew that MidCoast, as the stock purchaser, had no intention of ever paying the tax liabilities. Second, the taxpayer did not conduct the proper due diligence. And third, the financing for the stock purchase was a sham. The unique facts of Feldman are not applicable to the instant case. CHC is also factually distinguishable because a distribution was made to a shareholder, a factor not present in the instant case.

To reflect the foregoing,

<u>Decisions will be entered for petitioners</u>.