T.C. Memo. 2015-201

UNITED STATES TAX COURT

MICHAEL A. TRICARICHI, TRANSFEREE, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 23630-12.                    Filed October 14, 2015.

Michael Desmond, Bradley A. Ridlehoover, and Craig D. Bell, for petitioner.

Heather L. Lampert, Julie Gasper, Katelynn Winkler, Candace Williams, and Robert Morrison, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, Judge: In a notice of liability, the Internal Revenue Service (IRS or respondent) determined that petitioner is liable for $21,199,347 plus interest as a transferee of the assets of West Side Cellular, Inc. (West Side). Petitioner was

**[\*2]** the sole shareholder of West Side, a C corporation, until he sold his shares to an affiliate of Fortrend International LLC (Fortrend) in September 2003. The type of transaction in which he sold his shares is commonly called an "intermediary company" or "Midco" transaction. The underlying tax liabilities of West Side include a tax deficiency of $15,186,570 and penalties of $6,012,777 for 2003.

Midco transactions, a type of tax shelter, were widely promoted during the late 1990s and early 2000s. MidCoast Credit Corp. (MidCoast), which plays a supporting role in this case, and Fortrend, which plays the principal role, were leading promoters of Midco transactions. Both have been involved in numerous transactions previously considered by this Court.[1] In Notice 2001-16, 2001-1 C.B.

---

[1] For Fortrend, see <u>Slone v. Commissioner</u>, T.C. Memo. 2012-57, <u>vacated and remanded</u>, __ F.3d __, 2015 WL 5061315 (9th Cir. Aug. 28, 2015); <u>Salus Mundi Found. v. Commissioner</u>, T.C. Memo. 2012-61, <u>rev'd and remanded</u>, 776 F.3d 1010 (9th Cir. 2014); <u>Frank Sawyer Trust of May 1992 v. Commissioner</u>, T.C. Memo. 2011-298, <u>rev'd and remanded</u>, 712 F.3d 597 (1st Cir. 2013); <u>Diebold v. Commissioner</u>, T.C. Memo. 2010-238, <u>vacated and remanded sub nom.</u> <u>Diebold Found., Inc. v. Commissioner</u>, 736 F.3d 172 (2d Cir. 2013). For MidCoast, see <u>Stuart v. Commissioner</u>, 144 T.C. __ (Apr. 1, 2015); <u>Cullifer v. Commissioner</u>, T.C. Memo. 2014-208; <u>Hawk v. Commissioner</u>, T.C. Memo. 2012-259; <u>Feldman v. Commissioner</u>, T.C. Memo. 2011-297, <u>aff'd</u>, 779 F.3d 448 (7th Cir. 2015); <u>Starnes v. Commissioner</u>, T.C. Memo. 2011-63, <u>aff'd</u>, 680 F.3d 417 (4th Cir. 2012); <u>Griffin v. Commissioner</u>, T.C. Memo. 2011-61. Samyak Veera, a principal of MidCoast, has been indicted for his role in promoting these arrangements. <u>United States v. Veera</u>, No. 12-444 (E.D. Pa. Oct. 1, 2013) (superseding indictment alleging Veera's involvement in MidCoast schemes to evade taxes by using fraudulent losses to eliminate target's gains).

**[*3]** 730, clarified by Notice 2008-111, 2008-51 I.R.B. 1299, the IRS listed Midco

transactions as "reportable transactions" for Federal income tax purposes.

Although Midco transactions took various forms, they shared several key

features, well summarized by the Court of Appeals for the Second Circuit in

Diebold Found. Inc. v. Commissioner, 736 F.3d 172, 175-176 (2d Cir. 2013),

vacating and remanding T.C. Memo. 2010-238. These transactions were chiefly

promoted to shareholders of closely held C corporations that had large built-in

gains. These shareholders, while happy about the gains, were typically unhappy

about the tax consequences. They faced the prospect of paying two levels of

income tax on these gains: the usual corporate-level tax, followed by a share-

holder-level tax when the gains were distributed to them as dividends or liqui-

dating distributions. And this problem could not be avoided by selling the shares.

Any rational buyer would normally insist on a discount to the purchase price equal

to the built-in tax liability that he would be acquiring.

Promoters of Midco transactions offered a purported solution to this prob-

lem. An "intermediary company" affiliated with the promoter--typically, a shell

company, often organized offshore--would buy the shares of the target company.

The target's cash would transit through the "intermediary company" to the selling

shareholders. After acquiring the target's embedded tax liability, the "intermedi-

[*4] ary company" would plan to engage in a tax-motivated transaction that would offset the target's realized gains and eliminate the corporate-level tax. The promoter and the target's shareholders would agree to split the dollar value of the corporate tax thus avoided. The promoter would keep as its fee a negotiated percentage of the avoided corporate tax. The target's shareholders would keep the balance of the avoided corporate tax as a premium above the target's true net asset value (i.e., assets net of accrued tax liability).

In due course the IRS would audit the Midco, disallow the fictional losses, and assess the corporate-level tax. But "[i]n many instances, the Midco is a newly formed entity created for the sole purpose of facilitating such a transaction, without other income or assets and thus likely to be judgment-proof. The IRS must then seek payment from other parties involved in the transaction in order to satisfy the tax liability the transaction was created to avoid." Id. at 176.

In a nutshell, that is what happened here. Petitioner engaged in a Midco transaction with a Fortrend shell company; the shell company merged into West Side and engaged in a sham transaction to eliminate West Side's corporate tax; the IRS disallowed those fictional losses and assessed the corporate-level tax against West Side; but West Side, as was planned all along, is judgment proof. The IRS accordingly seeks to collect West Side's tax from petitioner as the transferee of

**[\*5]** West Side's cash.  We hold that petitioner is liable for West Side's tax under the Ohio Uniform Fraudulent Transfer Act and that the IRS may collect West Side's tax liabilities in full from petitioner under section 6901(a)(1)[2] as a direct or indirect transferee of West Side.  We accordingly rule for respondent on all issues.

FINDINGS OF FACT

The parties filed stipulations of facts with accompanying exhibits that are incorporated by this reference.  At the time the Midco transactions were executed, petitioner resided in Ohio.  He moved shortly thereafter to Nevada, and he resided in Nevada at the close of the 2003 taxable year and when he petitioned this Court.

Petitioner graduated from Case Western Reserve University and embarked on a career in the cellular telephone (cell phone) business.  He incorporated West Side in 1988 as a C corporation.  Petitioner was the president and sole shareholder of West Side, and he and his wife, Barbara Tricarichi, served as its directors.

Although petitioner had no formal tax training, he displayed familiarity with tax concepts.  At trial he spoke easily about C corporations and S corporations, corporate tax rates, and other tax matters.  He explained that he organized West

---

[2]Unless otherwise noted, all statutory references are to the Internal Revenue Code as in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all dollar amounts to the nearest dollar.

[*6] Side as a C corporation because he thought it might ultimately have more shareholders than an S corporation would be permitted to have.

In 1991 petitioner approached Verizon and other major cellular service providers with a proposal that West Side would become a reseller of cell phone services. From 1991 through 2003 West Side engaged in various telecommunications activities in Ohio, including the resale of cell phone services. West Side had a retail presence in Ohio, customer and vendor relationships, goodwill, know-how, a workforce in place, trade names, and other tangible and intangible assets. At its peak West Side had about 15,000 subscribers throughout Ohio.

Beginning in 1991, West Side purchased network access from the major cellular service providers in order to serve its customers. Petitioner soon came to believe that certain of these providers were discriminating against West Side. In 1993 he engaged the Cleveland law firm of Hahn Loeser & Parks, LLP (Hahn Loeser), to file a complaint with the Public Utilities Commission of Ohio (PUCO) against certain of these providers, alleging anticompetitive trade practices. The PUCO lawsuit was a "bet the company" matter for petitioner, and he took a hands-on role in the lengthy litigation that ensued. Hahn Loeser lawyers described him as a constant presence at the firm throughout this period.

**[\*7]**   The PUCO ruled in West Side's favor on the liability issue and the Ohio Supreme Court affirmed that decision.  In early 2003 West Side returned to the Court of Common Pleas to commence the damages phase of the litigation.  Not long thereafter a settlement was reached, pursuant to which West Side ultimately received, during April and May 2003, total settlement proceeds of $65,050,141.  In exchange West Side was required to terminate its business as a retail provider of cell phone service and to end all service to its customers as of June 10, 2003.

Petitioner's "Tax Problem"

Anticipating a large settlement, petitioner began to regret his decision, 15 years earlier, to organize West Side as a C corporation.  He asked Jeffrey Folkman, a Hahn Loeser tax partner, to investigate how to "maximize whatever after-tax proceeds were available" from the anticipated settlement.  Petitioner's goal was to "pay less tax than what the straight up, you know, 35% or whatever the corporate tax rate was" and avoid the two-level tax on the settlement proceeds.

Mr. Folkman had experience with MidCoast and thought it might help solve petitioner's problem.  He arranged a meeting on February 19, 2003, with petitioner and MidCoast representatives.  In preparation for this meeting, Hahn Loeser attorneys devoted five days of research and discussion to the "sham transaction" doctrine, "reportable transactions," and Notice 2001-16.  Their billing records

**[*8]** describe Notice 2001-16 as addressing (among other things) a transaction involving a "shareholder who wants to sell stock of a target" and "an intermediary corporation." At the February 19 meeting, MidCoast's representatives explained to petitioner that it was in the "debt collection business" and that, as part of its business model, it purchased companies that "had large tax obligations."

Shortly after the meeting with MidCoast, petitioner's brother, James Tricarichi (James), introduced him to Fortrend. On February 24, 2003, petitioner received a letter from Fortrend; he subsequently had several conference calls and at least one face-to-face meeting with Fortrend representatives. Petitioner understood that Fortrend and MidCoast were both involved with "distressed debt receivables" and had basically the same business model. Fortrend told petitioner that it would purchase his West Side stock and would offset the taxable gain with losses, thereby eliminating West Side's corporate income tax liability.

MidCoast and Fortrend each expressed interest in acquiring petitioner's West Side stock, and each made an offer proposing essentially the same transactional structure. An intermediary company would borrow money to purchase the stock. The cash held by West Side would be used immediately to repay the loan. The cash petitioner received from the intermediary company would substantially exceed West Side's net asset value. The intermediary company would receive a

[*9] fee equal to a negotiated percentage of West Side's tax liabilities. And after the sale closed, the intermediary company, after merging into West Side, would use bad debt deductions to eliminate those tax liabilities.

Because petitioner regarded MidCoast and Fortrend as competitors, he began negotiating with both in the hope of stirring up a bidding war. James arranged further conference calls with both companies. Rather than compete, MidCoast secretly agreed with Fortrend to step away from the transaction in exchange for a fee of $1,180,000 (ultimately paid by West Side on September 14, 2003). MidCoast's final offer was adjusted to make it seem unattractive, and petitioner therefore chose to pursue discussions with Fortrend in order to "maximize" his profits.

Bringing in PricewaterhouseCoopers

James recommended that petitioner retain PricewaterhouseCoopers (PwC) to advise him about the proposed stock sale. Acting as a conduit between petitioner and PwC, James sent a letter dated April 8, 2003, to PwC partner Richard Stovsky. This letter requested advice concerning a stock sale to MidCoast or Fortrend and a fallback strategy to mitigate petitioner's tax liability if the stock sale did not occur. PwC sent petitioner a draft engagement letter on April 10, 2003.

By this time petitioner had had extensive discussions with Mr. Folkman about Notice 2001-16, and the risk that the contemplated stock sale would give

[*10] rise to a "reportable transaction." Upon receipt of PwC's draft engagement letter, petitioner reacted negatively to the following sentence: "You agree to advise us if you determine that any matter covered by this Agreement is a reportable transaction that is required to be disclosed." Petitioner struck this sentence from the engagement letter, initialed the change, and sent the draft back to PwC.[3]

Petitioner testified that he struck this sentence from the draft engagement letter because he wanted to ensure that PwC would thoroughly investigate all relevant issues. The Court did not find this testimony credible. Mr. Stovsky's draft engagement letter stated that PwC would investigate the relevant issues; the sentence about "reportable transactions" was included as a matter of PwC's due diligence to ensure that the client disclosed all relevant facts to it. The Court finds that petitioner struck this sentence from the draft engagement letter because he wanted to keep the paper trail free, to the maximum extent possible, of any references to "reportable transactions."

Working with tax professionals from several PwC offices, Mr. Stovsky prepared an internal memorandum addressing the proposed sale of West Side stock to Fortrend or MidCoast. This memorandum was revised multiple times as the nego-

---

[3]Petitioner's effort to strike this language from the engagement letter was ultimately unsuccessful. Mr. Stovsky insisted on retaining this language and, after further negotiations, petitioner acquiesced.

[*11] tiations evolved, and various drafts were discussed with petitioner and his advisers. The first draft of the memorandum, dated April 13, 2003, stated the following assumptions about the proposed transaction:

- [Buyer will] borrow $36,000,000 and purchase 100% of the Westside shares outstanding from * * * [petitioner]. * * *

- [Buyer will] contribute to Westside * * * high basis/low fair market value property (the assumption is that these are delinquent receivables).

- Westside is now in the business of purchasing "distressed/charged-off" credit card debt * * * at pennies on the dollar and collecting on this debt.

- The business purpose for the acquisition of Westside is based on the new business' need for cash to purchase the charged-off credit card debt as commercial financing for such purchases is apparently difficult. Westside's cash and accounts receivable will provide such needed cash (note that most of the $40,000,000 cash in Westside will be distributed out of Westside and used by * * * [the buyer] to pay back the cash borrowed to purchase * * * [petitioner's] Westside stock).

- Westside writes off (apparently deductible for federal income tax purposes) some of the high basis/low fair market value property contributed by * * * [the buyer]. The deduction offsets the taxable income created within Westside upon the receipt of the $65,000,000 from the legal verdict.

- Westside, now a charged off debt business, utilizes "cost recovery tax accounting" which, apparently, results in tax deductions as a portion of the purchased credit card debt is collected.

- The suggested result, from a federal tax perspective, is as follows:

**[*12]** • [Petitioner] recognizes long-term capital gain upon the sale of his shares in Westside * * *.

• Westside offsets the taxable income from the legal verdict with the write off of high basis property.

The memorandum notes that petitioner planned to move from Ohio to a State without an income tax so that there would be no State tax on his gains.

PwC understood that Notice 2001-16 applied to Midco transactions described therein and to "substantially similar" transactions. Marginal notes on the memorandum also suggest PwC's understanding that the term "substantially similar" was to be broadly construed. But PwC concluded that "a position can be taken" that the stock sale would not be a reportable transaction. This was because "[a] typical 'Midco' transaction [has] 3 parties (this transaction only has 2), and a typical 'Midco' transaction results in an asset basis step up and the associated amortization deductions going forward (this transaction does not have these characteristics)."

The memorandum concluded that the proposed transaction was not without risk. It noted a particularly high level of risk in the "high basis/low value" debt receivable strategy that the buyer proposed to eliminate West Side's tax liabilities. PwC characterized this as a "very aggressive tax-motivated" strategy and indicated that the IRS would likely challenge the deductibility of the bad debt loss expected

[*13] to be reported by West Side after the stock sale.  Pointedly absent from the memorandum is any indication that PwC believed this strategy was "more likely than not" to be successful.  Regardless, the memorandum suggested that "this is not * * * [petitioner's] concern" since the result would be a corporate tax liability and not petitioner's liability.  The memorandum noted that PwC had provided no formal written advice to petitioner but had discussed its conclusions orally with him.

Formation of LXV

Petitioner's representatives communicated with Fortrend after meeting with PwC.  During these conversations Fortrend made clear that it did not want to acquire West Side's accounts receivable or any of its other operating assets.  Rather, Fortrend wanted all operating assets stripped out of West Side before the closing so that West Side would be left with nothing but cash and tax liabilities.

In order to meet Fortrend's requirements, petitioner and three West Side employees formed LXV Group, LLC (LXV), an Ohio limited liability company, on May 2, 2003, to acquire West Side's operating assets.  Each contributed $25,000 for his respective 25% interest in LXV.  As mandated by the PUCO settlement agreement, West Side had to discontinue providing cell phone service to its customers by June 10, 2003.  On June 11, 2003, LXV purchased all of West

**[*14]** Side's operating assets, namely, its goodwill and its "revenue producing wireless customer base, accounts receivable, Trade names, Trade marks, chattels, fixtures, software and equipment" used in the operation of West Side's business.

The purchase price that LXV paid for these assets was $100,044. That amount was substantially less than the sum of West Side's net physical assets and accounts receivable ($74,564 + $166,940 = $241,504) as stated on West Side's balance sheet.[4] The parties to this transaction thus appear to have attached a value of zero to West Side's wireless customer base, trade marks, and trade names. Mr. Stovsky voiced concern that if fair market value were not paid for these assets, petitioner might face risk because of "the transferee liability issue." Despite this warning, petitioner did not obtain a valuation of the assets thus transferred.

Petitioner testified that his motivation for this sale was to "continue to service West Side's customers." The Court did not find this testimony credible. The parties' placement of zero value on West Side's intangible assets, including its wireless customer base, trade name, and trade marks, belies any intention to serve those customers in the future. Indeed, it is not clear how LXV could continue to

---

[4]West Side's balance sheet at the relevant time listed $302,357 in assets (less $227,793 in accumulated depreciation) and accounts receivable of $50,936 and $116,004. The assets consisted of computers, software, furniture/fixtures, office equipment, shop equipment, and leasehold improvements. LXV did not assume any of the liabilities reflected on West Side's balance sheet.

[*15] serve West Side's cell phone customers because West Side's principals, who were also LXV's principals, were barred after June 10, 2003, from conducting any form of cell phone business. The Court finds as a fact that petitioner arranged the sale of West Side's operating assets to LXV in order to comply with Fortrend's requirement that West Side have nothing left in it except tax liabilities and cash.

Negotiation of the Stock Purchase Agreement

The parties adopted as their working assumption that West Side's accrued tax liability resulting from the $65 million PUCO settlement would not be paid. Since West Side at closing was to have only cash and tax liabilities, and since cash has a readily ascertainable value, the major item for negotiation was how to carve up the corporate tax liability thus avoided. The parties referred to this exercise as determining the "Fortrend premium." Petitioner actively participated in the negotiation of this point. Neither Hahn Loeser nor PwC participated in the negotiation of the stock purchase price or the "Fortrend premium."

The trial record sheds little light on the early stages of the negotiations, when MidCoast was still involved. During later stages of the negotiations, the dollar amount of the "Fortrend premium" varied, but each iteration of the agreement contained the same formulaic calculation. Fortrend would pay petitioner the amount of cash remaining in West Side at the closing, less 31.875% of West

[*16] Side's total Federal and State tax liability for 2003. In other words, the "Fortrend premium" equaled 31.875% of West Side's accrued 2003 tax liability. This left petitioner with a premium, above and beyond West Side's closing net asset value, equal to 68.125% of its accrued 2003 tax liability.

At two points in his testimony, petitioner stated that he did not understand the "Fortrend premium" to have any correlation to West Side's tax liabilities. The Court did not find this testimony credible. Petitioner testified that he participated in negotiating Fortrend's fee, and numerous spreadsheets prepared by his brother explicitly state that Fortrend's fee was to equal 31.875% of West Side's accrued tax liabilities for 2003. Confronted with this evidence, petitioner became visibly uncomfortable. The Court finds as a fact that petitioner knew at all times that the "Fortrend premium" would be computed as a negotiated percentage of West Side's 2003 corporate tax liability.

In preparation for the stock sale, Millennium Recovery Fund, LLC (Millennium), a Fortrend affiliate incorporated in the Cayman Islands, created Nob Hill, Inc. (Nob Hill), a shell company also incorporated in the Cayman Islands. Nob Hill was to be the "intermediary company" that would purchase the West Side stock. John McNabola was the sole officer of Millennium and Nob Hill.

[*17] The Hahn Loeser lawyers negotiated with Fortrend the technical details of the stock purchase agreement. Nob Hill provided covenants aimed at mitigating the risk that the transaction would be characterized as a "liquidation" of West Side. Nob Hill represented that West Side would remain in existence for at least five years after the closing, would "at all times be engaged in an active trade or business," and would "maintain a net worth of no less than $1 million" during this five-year period. (None of these representations was substantially honored.)

Nob Hill also provided purported tax warranties. The agreement represented that Nob Hill would "cause * * * [West Side] to satisfy fully all United States * * * taxes, penalties and interest required to be paid by * * * [West Side] attributable to income earned during the [2003] tax year." The agreement did not specify how Nob Hill would "cause" West Side to satisfy its 2003 tax liabilities or explain the strategy it would use to offset West Side's gain from the $65 million PUCO settlement. Nob Hill agreed to indemnify petitioner in the event of liability arising from breach of its representation to "satisfy fully" West Side's 2003 tax liability. Petitioner's expert, Wayne Purcell, admitted that "there can be problems" enforcing warranties and covenants against offshore entities like Nob Hill that have no assets in the United States.

[*18] Petitioner's lawyers attempted to include in the stock purchase agreement a provision prohibiting West Side from engaging in a "listed transaction" after Fortrend acquired West Side. Fortrend refused to agree to this provision. Instead, the parties negotiated a statement that Nob Hill "has no intention" of causing West Side to engage in a listed transaction.

Petitioner Accepts Fortrend's Offer

A letter of intent dated July 22, 2003, set forth the terms on which Nob Hill proposed to acquire petitioner's stock. It stated a tentative purchase price of $34.9 million, subject to fine-tuning based on West Side's final cash position. The letter indicated that West Side would deposit $50,000 in escrow to cover fees should the transaction fail to close.

After the transfer of West Side's operating assets to LXV, West Side's balance sheet reflected total assets of $40,577,151, including $39,949,373 in cash, a $577,778 loan receivable from petitioner, and the $50,000 receivable from the escrow agent. West Side's aggregate 2003 tax liabilities were estimated to be $16,853,379. West Side's net asset value as of late July--that is, its assets minus its accrued tax liability--was thus $23,723,772. Nob Hill offered to pay petitioner $34.9 million for his stock--$11.2 million more than West Side was worth--in ex-

[*19] change for a fee (the "Fortrend premium") comfortably in excess of $5 million. Petitioner decided to accept this offer.

Petitioner's "due diligence" expert, Mr. Purcell, testified that a seller who receives an all-cash offer for his stock is mainly concerned with making sure he gets paid. Mr. Purcell agreed, however, that a seller in petitioner's position must nevertheless exercise a certain level of due diligence. Hahn Loeser's bankruptcy lawyers advised that petitioner needed to assure himself that Nob Hill and Fortrend would live up to their postclosing obligations. And Mr. Purcell agreed that "due diligence did require * * * [petitioner] and his advisors to investigate Fortrend's plans" for eliminating West Side's 2003 tax liabilities.

Neither petitioner nor his advisers performed any due diligence into Fortrend or its track record. Neither petitioner nor his advisers performed any meaningful investigation into the "high basis/low value" scheme that Fortrend suggested for eliminating West Side's accrued 2003 tax liability. Petitioner was evasive when asked how he expected Fortrend to pull off this feat; he testified as to his belief that Fortrend "had some sort of tax reduction process" that would somehow "use bad debt to reduce tax liability." PwC specifically declined to provide assurance that Fortrend's bad debt strategy was "more likely than not" to succeed.

[*20] <u>Preparation for the Closing</u>

The stock purchase transaction was carefully structured to ensure that Fortrend and its affiliates made no real outlay of cash. Fortrend planned to borrow the entire $34.9 million tentative purchase price: $5 million from Moffatt International (Moffatt), a Fortrend affiliate, and $29.9 million from Coöperatieve Centrale Raiffeisen-Boerenleenbank, B.A. (Rabobank), a Dutch bank.[5] West Side's cash would be used to repay these loans immediately, so that the nominal lenders bore no risk.

The financing process began on August 13, 2003, when Fortrend mailed Chris Kortlandt of Rabobank, requesting a $29.9 million short-term loan. Two weeks later, Mr. Kortlandt requested internal approval of this loan, with Nob Hill as the nominal borrower. Mr. Kortlandt understood that West Side would be required to have cash in excess of $29.9 million on deposit with Rabobank when the stock purchase closed. He therefore considered the risk of nonpayment of the loan

---

[5]The $29.9 million loan was provided through a Rabobank subsidiary, Utrecht-America Finance Co. For simplicity, we will refer to these entities collectively as Rabobank. Rabobank frequently partnered with Fortrend in executing Midco deals. It has been involved in numerous transactions previously considered by this Court. <u>See, e.g.</u>, <u>Salus Mundi Found.</u>, T.C. Memo. 2012-61; <u>Slone</u>, T.C. Memo. 2012-57; <u>Frank Sawyer Trust of May 1992</u>, T.C. Memo. 2011-298; <u>Diebold</u>, T.C. Memo. 2010-238; <u>LR Dev. Co. LLC v. Commissioner</u>, T.C. Memo. 2010-203.

[*21] to be essentially zero. The risk rating shown on Nob Hill's credit application was "N/A, or based on collateral: R-1 (cash)." Rabobank uses the R-1 risk rating to denote a loan that is fully cash collateralized.

On August 21, 2003, petitioner received instructions to open at Rabobank an account for West Side with account number ending in 1577, to which West Side's cash would eventually be transferred. To receive the cash proceeds from the stock sale, petitioner opened an individual Rabobank account with account number ending in 1595. To shuttle cash at the closing, Nob Hill opened a Rabobank account with account number ending in 1568.

In connection with the Rabobank financing, Mr. McNabola planned to execute two sets of documents at the closing. He would sign the first set on behalf of Nob Hill as its president. He would sign the second set on behalf of West Side as its postclosing president-to-be.

The Nob Hill documents to be executed by Mr. McNabola included a promissory note for $29.9 million, a security agreement, and a pledge agreement. Pursuant to the security agreement, Nob Hill granted Rabobank a first priority security interest in West Side's Rabobank account to secure Nob Hill's repayment obligation. Pursuant to the pledge agreement, Nob Hill granted Rabobank a first

**[*22]** priority security interest in the West Side stock and the stock sale proceeds as collateral securing Nob Hill's repayment obligation.

The West Side documents to be executed by Mr. McNabola included security and guaranty agreements in favor of Rabobank and a "control agreement." West Side unconditionally guaranteed payment of Nob Hill's obligations to Rabobank, and the security agreement granted Rabobank a first priority security interest in the West Side Rabobank account. The "control agreement" gave Rabobank control over West Side's account--including all "cash, instruments, and other financial assets contained therein from time to time, and all security entitlements with respect thereto"--to ensure that West Side did not default on its commitments.

As petitioner's UCC expert, Barkley Clark, correctly noted, Mr. McNabola as Nob Hill's president could not grant Rabobank a perfected security interest in West Side's assets until Nob Hill acquired West Side's stock. And Mr. McNabola as West Side's president could not grant Rabobank a perfected security interest in West Side's assets until he became West Side's president. At the closing, however, all of these documents were to become effective simultaneously with the funding of the Rabobank loan, the payment of the stock purchase price, and the resignation of West Side's former officers and directors. These agreements effectively gave Rabobank a "springing lien" on West Side's cash at the moment it

[*23] funded the loan. For all practical purposes, therefore, the Rabobank loan was fully collateralized with the cash in West Side's Rabobank account, consistently with the R-1 risk rating that Rabobank assigned to that loan.

The Closing

The closing was scheduled for September 9, 2003. The final stock purchase price was to be $34,621,594 in cash plus a $577,778 check payable to petitioner to zero out his shareholder loan. On September 8, Fortrend deposited the $5 million "loan proceeds" from Moffatt into Nob Hill's Rabobank account. Also on September 8, petitioner deposited West Side's $39,949,373 ending cash balance into West Side's Rabobank account. The funds in these accounts earned overnight interest of $135 and $1,076, respectively.

On September 9, 2003, the following events occurred. Nob Hill's Rabobank account was credited with the $29.9 million Rabobank loan proceeds and $35 million in cash from West Side's Rabobank account. From this account, Nob Hill transferred $34,621,594 into petitioner's Rabobank account; transferred $29.9 million to repay the Rabobank loan (which bore no interest); transferred $5 million to repay the Moffatt loan (which bore no interest); transferred $150,000 to cover Rabobank's fees; and transferred $150,000 to West Side's Rabobank account. Petitioner immediately withdrew the entire balance of his Rabobank account and

[*24] deposited it into a personal account at Pershing Bank. When the dust settled at the end of the day, petitioner's Rabobank account had a balance of zero; petitioner's Pershing Bank account had a balance of $34,621,594; West Side's Rabobank account had a balance of $5,100,450; and Nob Hill's Rabobank account had a balance of $78,541.

The next day, Nob Hill merged into West Side with West Side surviving. The $5,100,450 remaining in West Side's Rabobank account and the $78,541 remaining in Nob Hill's Rabobank account were later transferred into a West Side account at the Business Bank of California. West Side eventually transferred $4,766,000 out of that account to Fortrend affiliates and various promoters, including MidCoast, which on September 14, 2003, received the promised $1,180,000 for stepping away from the transaction. By late 2004, West Side's bank accounts had been drained of funds and were closed.

The Bad Debt Strategy

The background of Fortrend's strategy for eliminating West Side's 2003 tax liability begins in 2001. On March 7, 2001, United Finance Co. Ltd. (United Finance) purportedly contributed a portfolio of charged-off Japanese debt (Japanese debt portfolio) to Millennium in exchange for Millennium class B shares. (Millennium eventually became Nob Hill's, and then West Side's, parent.) The Japan-

**[\*25]** ese debt portfolio was valued at $137,109. Two days later, United Finance sold the Millennium class B shares it had just acquired to Barka Limited, another Cayman Islands entity, for $137,000. Although Millennium had acquired the Japanese debt portfolio with property worth only $137,000, it claimed that its tax basis in that Portfolio was $314,704,037 as of June 30, 2003.

On November 6, 2003, Millennium contributed to West Side a subset of the Japanese debt portfolio, consisting of two defaulted loans (Aoyama loans). The Aoyama loans had a purported tax basis of $43,323,069. Between November 6 and December 31, 2003, West Side wrote off the Aoyama loans as worthless. On its Form 1120, U.S. Corporation Income Tax Return, for 2003, West Side claimed a bad debt deduction of $42,480,622 on account of that writeoff.

There is no evidence that West Side conducted meaningful business operations after September 10, 2003. It had no employees after that date. It reported no gross receipts, income, or business expenses relating to its supposed "debt collection" business. There is no evidence that it made any effort to collect the Aoyama loans or contracted with any third party to do so. Although Nob Hill had represented that West Side would "maintain a net worth of no less than $1 million" during the five-year period following the closing, West Side did not do so. The following table shows West Side's asset balances as reported to the IRS:

**[*26]**

| Tax year | Asset balance as of 12/31 |
|----------|---------------------------|
| 2003 | $1,829,395 |
| 2004 | 313,300 |
| 2005 | 1,171,609 |
| 2006 | 942,589 |
| 2007 | -0- |

Petitioner offered no evidence to show that the actual value of West Side's assets corresponded to these reported amounts. Given Fortrend's track record, we do not take these reported amounts at face value.

West Side's Tax Returns and IRS Audit

West Side's Form 1120 for 2003 described it as incorporated in the Cayman Islands, doing business in Ireland, and having its address in Las Vegas, Nevada. It described its parent, Millennium, as incorporated in the Cayman Islands and doing business in Ireland. West Side reported for 2003 total income of $66,116,708 and total deductions of $67,840,521. The deductions included salaries and wages of $8,315,605, other deductions of $16,542,448, and bad debt losses of $42,480,622.

On January 9, 2006, West Side filed Form 1120X, Amended U.S. Corporation Income Tax Return, for 2003. Apart from correcting minor errors and listing a new address in Reno, Nevada, the amended return did not differ materially from the original. Both returns were prepared using the accrual method of accounting.

[*27] The IRS examined West Side's 2003 return.  During the examination, the IRS was unable to find any assets or current sources of income for West Side; a March 28, 2008, memorandum details the steps the IRS took in search thereof.  At the conclusion of the audit, the IRS disallowed the $42,480,622 bad debt deduction and $1,651,752 of the deduction claimed for legal and professional fees, on the ground that these fees were incurred in connection with a transaction entered into solely for tax avoidance.

West Side's authorized representative executed successive Forms 872, Consent to Extend the Time to Assess Tax, that extended to December 31, 2009, the time for assessing West Side's 2003 tax liability.  On February 25, 2009, the IRS mailed a timely notice of deficiency to West Side determining a deficiency of $15,186,570 and penalties of $61,851 and $5,950,926 under section 6662(a) and (h), respectively.  West Side did not petition this Court and, on July 20, 2009, the IRS assessed the tax and penalties set forth in the notice of deficiency, plus accrued interest.  On April 5, 2011, West Side's corporate charter was canceled by the Ohio secretary of state.

Notice of Transferee Liability

Petitioner and Barbara Tricarichi jointly filed Form 1040, U.S. Individual Income Tax Return, for 2003 showing a Nevada address.  This return reported a

[*28] tax liability of $5,303,886, resulting chiefly from gain on the sale of petitioner's West Side stock.  On Schedule D, Capital Gains and Losses, petitioner reported the proceeds from this sale as $35,199,357, reflecting both the cash he received and the $577,778 check, resulting in a long-term capital gain of $35,170,793.

The IRS did not audit petitioner's Form 1040, but it did open a transferee-liability examination concerning West Side's 2003 tax liabilities.  Upon completion of that examination, the IRS sent petitioner a Letter 902-T, Notice of Liability.  This notice of liability was timely mailed to petitioner on June 25, 2012.[6]  The notice determined that petitioner is liable as transferee for the following liabilities of West Side:

---

[6]In his petition, petitioner challenged the timeliness of the notice of liability. The Commissioner generally must assess transferee liability within one year after expiration of the period of limitations on the transferor, but the applicable period of limitations may be extended by agreement.  See sec. 6901(c) and (d).  Petitioner executed successive Forms 977, Consent to Extend the Time to Assess Liability at Law or in Equity for Income, Gift and Estate Tax Against a Transferee or Fiduciary, extending to June 30, 2012, the time for assessing transferee liability against him, and the notice of liability was timely issued on June 25, 2012.  Petitioner abandoned in his posttrial briefs any challenge to the timeliness of the notice of liability, and that argument is thus deemed conceded.

| [*29]    Deficiency | Penalty sec. 6662(a), (d) | Penalty sec. 6662(h) |
|---|---|---|
| $15,186,570 | $61,851 | $5,950,926 |

Petitioner timely petitioned this Court for review of the notice of liability.[7]

OPINION

I.    Legal Standard and Burden of Proof

Petitioner resided in Nevada when he filed his petition.  The parties have stipulated that any appeal of this case will lie to the U.S. Court of Appeals for the Ninth Circuit.  See sec. 7482(b)(1)(A); Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971).  That Court has held that "the tax decisions of other circuits should be followed unless they are demonstrably erroneous or there appear cogent reasons for rejecting them."  Popov v. Commissioner, 246 F.3d 1190, 1195 (9th Cir. 2001) (quoting Unger v. Commissioner, 936 F.2d

---

[7]In addition to the amounts listed in the notice of liability, petitioner proposed as a finding of fact (to which respondent did not object) that respondent determined "assessed interest" of $8,475,655 as well as "accrued interest and penalties" of $12,362,425.  In their posttrial briefs the parties have not addressed the proper computation of interest or the existence of penalties other than those determined by respondent under section 6662(a), (d), and (h).  We will accordingly enter decision in this case under Rule 155.

**[\*30]** 1316, 1320 (D.C. Cir. 1991), aff'g T.C. Memo. 1990-15), aff'g in part, rev'g in part and remanding T.C. Memo. 1998-374.

Under section 6901, the Commissioner may proceed against a transferee of property to assess and collect Federal income tax, penalties, and interest owed by a transferor. Respondent contends that petitioner, as transferee, is liable for the unpaid 2003 Federal tax liabilities of West Side. Petitioner contends that Nob Hill purchased his stock moments before it received West Side's cash; that Rabobank and Moffat were the source of the cash used to purchase his stock; and that he thus received no "transfer" from West Side that could make him liable as its "transferee."

Section 6901 does not impose substantive liability on the transferee but simply gives the Commissioner a remedy or procedure for collecting an existing liability of the transferor. Commissioner v. Stern, 357 U.S. 39, 42 (1958). To take advantage of this procedure, the Commissioner must establish an independent basis under applicable State law for holding the transferee liable for the transferor's debts. Sec. 6901(a); Commissioner v. Stern, 357 U.S. at 45; Hagaman v. Commissioner, 100 T.C. 180, 183 (1993). State law thus determines the transferee's substantive liability. Ginsberg v. Commissioner, 305 F.2d 664, 667 (2d Cir. 1962), aff'g 35 T.C. 1148 (1961). In this respect, section 6901 places the Commissioner

[*31] in "precisely the same position as that of ordinary creditors under state law." Starnes v. Commissioner, 680 F.3d 417, 429 (4th Cir. 2012), aff'g T.C. Memo. 2011-63. The parties agree that the State law applicable here is that of Ohio, where petitioner resided, West Side did business, and the principal transactions occurred. See Commissioner v. Stern, 357 U.S. at 45; Estate of Miller v. Commissioner, 42 T.C. 593, 598 (1964).

Once the transferor's own tax liability is established, the Commissioner may assess that liability against a transferee under section 6901 only if two distinct requirements are met. First, the transferee must be subject to liability under applicable State law, which includes State equity principles. Second, under principles of Federal tax law, that person must be a "transferee" within the meaning of section 6901. See Diebold Found., Inc., 736 F.3d at 183-184; Starnes, 680 F.3d at 427; Swords Trust v. Commissioner, 142 T.C. 317, 336 (2014).

The Commissioner bears the burden of proving that a person is liable as a transferee. Sec. 6902(a); Rule 142(d). The Commissioner does not have the burden, however, "to show that the taxpayer was liable for the tax." Sec. 6902(a). Under normal burden-of-proof rules, therefore, petitioner has the burden of proving that West Side is not liable for the $21,199,347 of tax and penalties that the IRS assessed against it for 2003. Rule 142(a)(1), (d); Welch v. Helvering, 290

**[\*32]** U.S. 111, 115 (1933); see United States v. Williams, 514 U.S. 527, 539 (1995) (noting that "the Code treats the transferee as the taxpayer" for this purpose); L.V. Castle Inv. Grp., Inc. v. Commissioner, 465 F.3d 1243, 1248 (11th Cir. 2006).

The burden of proof on factual issues may be shifted to the Commissioner if the taxpayer introduces "credible evidence" with respect thereto and satisfies other requirements. Sec. 7491(a)(1) and (2). Petitioner asked that we shift to respondent the burden of proof with respect to West Side's 2003 tax liability. We decline this request. Petitioner introduced no "credible evidence" concerning the $42,480,622 bad debt deduction that generated West Side's 2003 deficiency. In any event, it does not matter who bears the burden of proof because the preponderance of the evidence favors respondent's position as to all material facts.[8]

II.   West Side's 2003 Federal Tax Liability

In the notice of deficiency to West Side, the IRS disallowed a deduction of $1,651,752 for legal and professional fees and a deduction of $42,480,622 for bad

---

[8]Whether the burden has shifted matters only in the case of an evidentiary tie. See Polack v. Commissioner, 366 F.3d 608, 613 (8th Cir. 2004), aff'g T.C. Memo. 2002-145. In this case, we discerned no evidentiary tie on any material issue of fact. See Payne v. Commissioner, T.C. Memo. 2003-90, 85 T.C.M. (CCH) 1073, 1077 (2003).

**[*33]** debts.  The notice also determined an accuracy-related penalty of $61,851 and a penalty of $5,950,926 for a "gross valuation misstatement" under section 6662(h).

The deduction for legal and professional fees was disallowed on the ground that these fees were incurred in connection with a tax-avoidance transaction.  We conclude below that the transaction by which Nob Hill acquired petitioner's West Side stock was indeed entered into for the sole purpose of tax avoidance.  Petitioner provided no evidence to establish that any of the disallowed professional fees were incurred in connection with some other, legitimate, transaction.  Petitioner has thus failed to carry his burden of proving that any portion of these fees constituted deductible business expenses of West Side under section 162.  See Agro Sci. Co. v. Commissioner, 934 F.2d 573, 576 (5th Cir. 1991), aff'g T.C. Memo. 1989-687; Simon v. Commissioner, 830 F.2d 499, 500-501 (3d Cir. 1987), aff'g T.C. Memo. 1986-156; Cullifer v. Commissioner, T.C. Memo. 2014-208, at *45.

West Side's claimed $42,480,622 bad debt loss was based on the assertion that the two Aoyama loans had a tax basis of $43,323,069.  That assertion is preposterous because those loans were a subset of a larger portfolio of loans that had

**[\*34]** a tax basis of approximately $137,000.  Petitioner introduced no credible evidence to substantiate the basis claimed.[9]

Petitioner does not seriously dispute West Side's liability for the $61,851 accuracy-related penalty.[10]  For returns filed on or before August 17, 2006, a "gross valuation misstatement" exists where the basis claimed equals or exceeds 400% of the correct amount.  Sec. 6662(h)(2); sec. 1.6662-5(e)(2), Income Tax Regs.  Claiming a tax basis of $43,323,069 for the Aoyama loans, which had an actual basis of substantially less than $137,000, is unquestionably a "gross valuation misstatement."  Apart from challenging the deficiency on which the penalty is based, petitioner introduced no evidence to show that respondent's

---

[9]Petitioner argues that a memorandum solicited by Millennium from the Seyfarth Shaw law firm was sufficient to substantiate the bad-debt deduction.  We give no weight to that memorandum.  It was based on assumed facts provided by Mr. McNabola; those assumed facts are contradicted by the record evidence in this case; and the memorandum explicitly states that no one but Millennium can rely upon it.  Seyfarth Shaw gained notoriety for issuing bogus tax-shelter opinions, and this document seems par for the course.  See, e.g., Kenna Trading, LLC v. Commissioner, 143 T.C. 322 (2014); Superior Trading, LLC v. Commissioner, 137 T.C. 70 (2011), aff'd, 728 F.3d 676 (7th Cir. 2013); Rogers v. Commissioner, T.C. Memo. 2014-141; Rogers v. Commissioner, T.C. Memo. 2011-277, aff'd, 728 F.3d 673 (7th Cir. 2013); Sterling Trading, LLC v. United States, 553 F. Supp. 2d 1152 (C.D. Cal. 2008).

[10]Petitioner disputes his liability for the penalties principally on the ground that the penalties for which West Side is liable cannot be collected from him as its transferee.  We address this argument infra pp. 61-63.

[*35] calculation of a section 6662(h) penalty of $5,950,926 was incorrect. Petitioner has thus failed to prove that respondent erred in determining against West Side for 2003 a tax deficiency of $15,186,570 and penalties of $61,851 and $5,950,926 under section 6662(a) and (h), respectively.

III.     Petitioner's Liability as Transferee of West Side

Section 6901 permits the Commissioner to assess tax liability against a person who is "the transferee of assets of a taxpayer who owes income tax." Salus Mundi Found. v. Commissioner, 776 F.3d 1010, 1017 (9th Cir. 2014), rev'g and remanding T.C. Memo. 2012-61. To impose that liability on a transferee, a court must first determine whether "the party [is] substantively liable for the transferor's unpaid taxes under state law," and next determine whether that party is a "transferee" within the meaning of section 6901. Slone v. Commissioner, __ F.3d __, 2015 WL 5061315, at *2 (9th Cir. Aug. 28, 2015) vacating and remanding T.C. Memo. 2012-57; see Commissioner v. Stern, 357 U.S. at 44-45. The two prongs of this inquiry are independent of one another. See Feldman v. Commissioner, 779 F.3d 448, 458 (7th Cir. 2015), aff'g T.C. Memo. 2011-297; Salus Mundi Found., 776 F.3d at 1012; Diebold Found., Inc., 736 F.3d at 185; Frank Sawyer Trust of May 1992 v. Commissioner, 712 F.3d 597, 605 (1st Cir. 2013), aff'g T.C. Memo. 2011-298; Starnes, 680 F.3d at 429.

**[\*36]** A.  Petitioner's Substantive Liability Under Ohio Law

In deciding matters of State law, we are generally guided by the decisions of the State's highest court.  If there is no relevant precedent from the State's highest court, but there is relevant precedent from an intermediate appellate court, "the federal court must follow the state intermediate appellate court decision unless the federal court finds convincing evidence that the state's supreme court likely would not follow it."  Ryman v. Sears, Roebuck & Co., 505 F.3d 993, 994 (9th Cir. 2007); see Commissioner v. Estate of Bosch, 387 U.S. 456, 465 (1967) (Federal court should apply what it "find[s] to be the state law after giving 'proper regard' to relevant rulings of other courts of the State"); Swords Trust, 142 T.C. at 342; Estate of Young v. Commissioner, 110 T.C. 297, 300, 302 (1998).  "Only where no state court has decided the point in issue may a federal court make an educated guess as to how that state's supreme court would rule."  Flintkote Co. v. Dravo Corp., 678 F.2d 942, 945 (11th Cir. 1982) (quoting Benante v. Allstate Ins. Co., 477 F.2d 553, 554 (5th Cir. 1973)).

In 1990 Ohio enacted the Uniform Fraudulent Transfer Act of 1984 (UFTA) as chapter 1336 of its Commercial Transactions Code.  See Ohio Rev. Code secs. 1336.01 to 1336.12 (hereafter OUFTA; all references to the OUFTA are to the version in effect during 2003).  Forty-three States and the District of Columbia

[*37] have adopted the UFTA in whole or in part. The version of the UFTA that Ohio adopted corresponds almost verbatim to the uniform law.

When interpreting Ohio statutes derived from uniform or model laws, the Ohio Supreme Court has regularly consulted opinions from sister State courts interpreting parallel provisions of their own statutes. See Stein v. Brown, 480 N.E.2d 1121 (Ohio 1985) (discussing other States' treatment of the Uniform Fraudulent Conveyance Act (UFCA), the UFTA's predecessor); Ohio Ins. Guar. Ass'n v. Simpson, 439 N.E.2d 1257 (Ohio Ct. App. 1981) (noting relevance of opinions from courts of other States when interpreting model or uniform laws).[11] Federal Courts of Appeals for five different Circuits, examining Midco transactions similar to that here, have recently issued opinions interpreting state laws that substantially incorporate the UFTA or its predecessor. See supra p. 2 and note 1. We believe that the Ohio Supreme Court would give proper regard to these decisions, and to the State court precedents on which they are based, when interpreting parallel provisions of the OUFTA.

---

[11]Ohio Supreme Court opinions considering the treatment of uniform acts by courts of other States include Al Minor & Assoc., Inc. v. Martin, 881 N.E.2d 850 (Ohio 2008) (Uniform Trade Secrets Act); Cruz v. Cumba-Ortiz, 878 N.E.2d 620 (Ohio 2007) (Uniform Interstate Support Act and Uniform Reciprocal Enforcement of Support Act); Erie Ins. Grp. v. Fisher, 474 N.E.2d 320 (Ohio 1984) (Uniform Declaratory Judgments Act); Levi v. Levi, 166 N.E.2d 744 (Ohio 1960) (Uniform Reciprocal Enforcement of Support Act).

[*38] The Ohio Supreme Court has emphasized that the OUFTA is a remedial statute that should be liberally construed to protect creditors. See Wagner v. Galipo, 553 N.E.2d 610, 613 (Ohio 1990); Locafrance United States Corp. v. Interstate Distrib. Servs., Inc., 451 N.E.2d 1222, 1225 (Ohio 1983) (interpreting the OUFTA's predecessor). The OUFTA defines "transfer" very broadly to include "every direct or indirect, absolute or conditional, and voluntary or involuntary method of disposing of or parting with an asset or an interest in an asset." OUFTA sec. 1336.01(L). Respondent argues that petitioner is a liable as a "transferee" of West Side's cash under four distinct sections of the Ohio statute. See id. secs. 1336.04(A)(1) and (2), 1336.05(A) and (B). The first of these is an actual fraud provision; the latter three are constructive fraud provisions.

OUFTA section 1336.04(A)(1), the actual fraud provision, applies in the case of any creditor regardless of whether his "claim * * * arose before or after the transfer was made." A transfer is fraudulent under this provision if the debtor made the transfer "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor." The statute sets forth 11 nonexclusive "badges of fraud" that may give rise to an inference of actual fraudulent intent. See id. sec. 1336.04(B).

Two of the constructive fraud provisions apply in the case of a creditor "whose claim arose before the transfer was made." Id. secs. 1336.05(A) and (B).

**[*39]** Section 1336.05(A), the provision most relevant here, provides that "[a] transfer made * * * by a debtor is fraudulent as to [such] a creditor" if the debtor made the transfer without receiving a reasonably equivalent value in exchange and the debtor "was insolvent at that time or * * * became insolvent as a result of the transfer." This provision applies regardless of a transferor's or transferee's actual intent. See Sease v. John Smith Grain Co., 479 N.E.2d 284, 287 (Ohio Ct. App. 1984) (holding that with respect to the OUFTA's predecessor, "[n]either the intent of the debtor nor the knowledge of the transferee need be proven"); Nelson v. Walnut Inv. Partners, L.P., 2011 U.S. Dist. LEXIS 75534 (S.D. Ohio 2011) (same).

The third constructive fraud provision applies whether the creditor's claim arose "before or after the transfer was made." OUFTA sec. 1336.04(A). "A transfer made * * * by a debtor is fraudulent as to [such] a creditor" if the debtor made the transfer "without receiving a reasonably equivalent value in exchange" and either: (1) "[t]he debtor was engaged * * * [in a] transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction," or (2) "[t]he debtor intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due." Ibid. This provision likewise applies regardless of the debtor's

**[\*40]** intent or transferee's actual knowledge. If the stated conditions of any constructive fraud provision are met, "the transfer is fraudulent as a matter of law." See Sease, 479 N.E.2d at 288.

### 1. Petitioner's Status Under Ohio Law as a "Transferee"

Under all four OUFTA provisions, a "transfer" of some kind must have been made from West Side as tax debtor to petitioner as transferee. This issue is the focus of the parties' dispute and its resolution affects analysis of the other OUFTA tests. We may thus conveniently discuss it first.

Petitioner insists that he was not literally a transferee of West Side's cash. According to petitioner, the cash he got came from Nob Hill, and the sources of that cash were the "loans" from Rabobank and Moffat. Nob Hill supposedly did not get West Side's cash, which it used to repay those "loans," until later that same day. For this reason, petitioner contends that he received no West Side assets that could subject him to liability as a fraudulent transferee under Ohio law.

Respondent contends that Ohio law would treat petitioner in substance as the transferee of West Side's cash. We agree with respondent for at least two reasons, each of which constitutes an alternative ground for sustaining his position. First, the "loans" from Rabobank and Moffat were shams, and West Side was the true source of the cash petitioner received. Second, the stock sale transaction would be

**[\*41]** recharacterized under Ohio law as a de facto liquidation of West Side, with petitioner receiving in exchange for his stock a $35.2 million liquidating distribution.[12]

a.    Sham Loans

In order to "finance" the purchase of West Side's stock from petitioner, Nob Hill "borrowed" $29.9 million from Rabobank and $5 million from Moffatt, a Fortrend affiliate.  Ohio courts have consistently allowed finders of fact, in appropriate circumstances, to disregard transactions as shams.  See, e.g., Rowe v. Standard

_____

[12]Respondent advances the "economic substance" and "substance over form" doctrines as additional theories to support his position, contending that the Ohio courts would disregard the form of the Midco transaction because it was not a true multiparty transaction, had no business purpose, and was engineered for the sole purpose of avoiding West Side's Federal and Ohio tax liabilities.  The Ohio courts have recognized and employed both doctrines.  See, e.g., First Banc Grp., Inc. v. Lindley, 428 N.E.2d 427, 428 (Ohio 1981) (affirming decision of Ohio Board of Tax Appeals and agreeing that "[t]o hold otherwise would allow form to control over substance"); Bloomingdale v. Stein, 42 Ohio St. 168 (Ohio 1884) (concluding in fraudulent transfer case that equity "look[s] through the form to the substance of the transaction"); Macior v. Limbach, 620 N.E.2d 227, 229 (Ohio Ct. App. 1993) (citing Humana, Inc. v. Commissioner, 881 F.2d 247, 255 (6th Cir. 1989), aff'g in part, rev'g in part 88 T.C. 197 (1987)) (employing Federal "economic substance" doctrine).  The "business purpose" petitioner now alleges for the Midco transaction--to generate greater after-tax profit for West Side's sole shareholder--is not cognizable under these two doctrines because it is simply a corollary of the tax-avoidance scheme.  And the facts we find to support respondent's position on the "sham loan" and "de facto liquidation" theories also show that the Midco transaction lacked economic substance.  In view of our disposition, however, we need not address these alternative theories as an independent justification for respondent's submission that petitioner is liable as a transferee under Ohio law.

[*42] <u>Drug Co.</u>, 9 N.E.2d 609, 613 (Ohio 1937) ("Of course a lease, valid on its face, may be a mere sham or device to cover up the real transaction; but such a subterfuge will not be permitted to become a cloak for illegal practices.  The courts will always pierce the veil to discover the real relationship."); <u>Selanders v. Selanders</u>, 2009 WL 1365226, at *11 (Ohio Ct. App. 2009) (affirming the trial court's decision and agreeing that "the entire transaction was quite possibly nothing more than a sham"); <u>Galley v. Galley</u>, 1994 WL 191431, at *5 (Ohio Ct. App. 1994) ("When that reason for the transfer of property * * * is disregarded as a sham, the * * * [finder of fact] could well conclude that the transfer was a fraudulent transfer[.]"); <u>Phillips v. Phillips</u>, 1994 WL 179950 (Ohio Ct. App. 1994).  We believe that an Ohio court would disregard as shams the "loans" purportedly extended by Rabobank and Moffat.

The Rabobank "loan" should be disregarded as a sham for at least three reasons.  First, this "loan" was extended and repaid the same business day, literally moments after Nob Hill received the alleged loan proceeds.  The essence of a loan is an extension of credit.  It is obvious that the parties to this transaction did not desire to receive from Rabobank, and that Nob Hill did not in fact receive, a true extension of credit.

**[*43]** Second, the "loan" by its terms did not bear interest. Instead, Rabobank received a "fee" of $150,000. This fee cannot represent interest: Since the "loan" was outstanding for less than a day, this fee would translate to annual interest of $54,750,000, almost twice the magnitude of the "loan." What Rabobank received was not interest on a loan but a fee for facilitating a tax shelter transaction. Rabobank was presumably able to charge such an outlandish fee because (1) from its vantage point, it was incurring reputational or business risks by accommodating a questionable transaction and (2) from petitioner's vantage point, the fee was being paid by the U.S. Treasury and not by him.

Third, the Rabobank "loan" was fully collateralized by the cash in West Side's Rabobank account. Nob Hill's credit application described the risk rating on this loan as "N/A, or based on collateral." ("N/A" presumably means "not applicable.") Rabobank gave the loan an R-1 risk rating, which denotes a loan that is fully cash collateralized. The documents executed at the closing gave Rabobank control over West Side's Rabobank account and a "springing lien" on West Side's cash the moment it funded the loan. Cash is fungible, and the consideration used to pay petitioner for his stock came in substance from West Side.

For essentially the same reasons, the $5 million "loan" extended by Moffat must also be disregarded as a sham. Like the Rabobank loan, it bore no interest;

**[\*44]** instead, Fortrend received a $5 million fee for assembling the entire tax shelter package. This "loan" did not represent a true extension of credit. It was simply an overnight shuffling of funds between two Fortrend entities designed to facilitate a tax-avoidance transaction.

We conclude that an Ohio court would apply the sham transaction doctrine to these loans, and we find that both loans were in fact shams. The totality of the circumstances shows that the nominal lenders provided these funds, not as bona fide extenders of credit, but simply as accommodation parties recruited by Fortrend to conceal the true nature of what was happening. What actually happened is that Rabobank electronically transferred cash from West Side's Rabobank account through Nob Hill's Rabobank account into petitioner's Rabobank account; the "loans" were utterly unnecessary and had no purpose except obfuscation. Since both loans were shams, Rabobank's transfer of funds from West Side's account into petitioner's account constituted a "direct or indirect * * * method of disposing of or parting with an asset." See OUFTA sec. 1336.01(L). Petitioner was thus was a "transferee" of West Side under Ohio law.

### b. De Facto Liquidation of West Side

Respondent alternatively contends that the transfers among West Side, Nob Hill, and petitioner should be collapsed and recharacterized under Ohio law as a

**[\*45]** partial or complete liquidation of West Side, with petitioner receiving in exchange for his shares a $35.2 million liquidating distribution ($34.6 million of cash plus a check for $577,778). Although the Ohio courts have not addressed this precise scenario, judicial interpretations of fraudulent transfer provisions similar to Ohio's establish that such transactions may be "collapsed" if the ultimate transferee had constructive knowledge that the debtor's debts would not be paid.

The Court of Appeals for the Ninth Circuit recently addressed the application of New York's fraudulent transfer provisions to a Midco transaction resembling that here. It concluded that multiple transfers could be collapsed under State law if the conduct of the ultimate transferees "show[ed] that they had constructive knowledge of the fraudulent scheme." Salus Mundi Found., 776 F.3d at 1020. Addressing the application of New York law to that same Midco transaction in Diebold Found., Inc., the Court of Appeals for the Second Circuit held that multi-party transactions can be collapsed where the debtor's property is "reconveyed * * * for less than fair consideration" and the ultimate transferee had "constructive knowledge of the entire scheme." 736 F.3d at 186.

The Court of Appeals for the Fourth Circuit, addressing the application of North Carolina's UFTA provisions to another Midco transaction, similarly ruled that multiple transfers can be collapsed if the ultimate transferee has constructive

**[\*46]** knowledge that the debtor's tax liabilities will not be paid. If the ultimate transferees are on "inquiry notice" and fail to conduct a sufficiently diligent investigation, "they are charged with the knowledge they would have acquired had they undertaken the reasonably diligent inquiry required by the known circumstances." Starnes, 680 F.3d at 434.

The Ohio courts have regularly consulted and followed the decisions of sister courts when interpreting the provisions of model laws, including the OUFTA's predecessor. See supra pp. 36-37 and note 11. The North Carolina UFTA provisions governing constructive fraud are substantially identical to Ohio's, and New York's fraudulent transfer provisions are similar in material respects. We conclude that the Ohio Supreme Court, if confronted with this question, would find persuasive and would follow these three Federal decisions and the state court precedents on which they are based. The transfers at issue here may thus be collapsed under the OUFTA if petitioner had constructive knowledge that West Side's Federal and Ohio tax liabilities would not be paid.[13]

---

[13]Petitioner argues that Ohio law does not permit transactions to be collapsed, citing Official Comm. of Unsecured Creditors of Grand Eagle Cos. v. Asea Brown Boveri, Inc., 313 B.R. 219, 230 (N.D. Ohio 2004) (declining to collapse a leveraged buyout where there was "no evidence of knowledge on the part of the Lenders that the acquisition would harm future creditors"). This case is inapposite because petitioner had at least constructive knowledge that Fortrend's tax-

(continued...)

[*47] Petitioner argues that he was not aware of Fortrend's "plan as a whole" to avoid West Side's income taxes. If this is true, it is irrelevant. Finding that a person had constructive knowledge does not require that he have actual knowledge of the plan's minute details. It is sufficient if, under the totality of the surrounding circumstances, he "should have known" about the tax-avoidance scheme. HBE Leasing Corp. v. Frank, 48 F.3d 623, 636 (2d Cir. 1995).

Constructive knowledge also includes "inquiry knowledge." "Inquiry knowledge" exists where the transferee was "aware of circumstances that should have led * * * [him] to inquire further into the circumstances of the transaction, but * * * [he] failed to make such inquiry." HBE Leasing Corp., 48 F.3d at 636. Some cases define constructive knowledge as the knowledge that ordinary diligence would have elicited, while other cases require more active avoidance of the truth. Diebold Found., Inc., 736 F.3d at 187. We need not decide which of these formulations is appropriate because petitioner had "constructive knowledge" under either standard.

Petitioner's "due diligence" expert, Mr. Purcell, testified that a seller who receives an all-cash offer for his stock is mainly concerned with ensuring that he

---

[13](...continued)
avoidance scheme would harm two creditors, the United States and Ohio.

[*48] gets paid. But he agreed that a seller in petitioner's position must nevertheless exercise a certain level of due diligence. Specifically, echoing the contemporaneous advice of Hahn Loeser's bankruptcy lawyers, Mr. Purcell testified that "due diligence did require [petitioner] and his advisors to investigate Fortrend's plans" for eliminating West Side's 2003 tax liabilities.

Neither petitioner nor his advisers performed any due diligence into Fortrend or its track record. Neither petitioner nor his advisers performed any meaningful investigation into the "high basis/low value" scheme that Fortrend suggested for eliminating West Side's accrued 2003 tax liabilities. Petitioner and his advisers were clearly suspicious about Fortrend's scheme. But instead of digging deeper, they engaged in willful blindness and actively avoided learning the truth.

Petitioner and his advisers knew that the transaction Fortrend was proposing was likely a "reportable" or "listed transaction." Before meeting with Fortrend, Hahn Loeser lawyers spent several days researching Notice 2001-16, "reportable transactions," "sham transactions," and transactions involving "an intermediary corporation." PwC insisted on including in its engagement letter a requirement that petitioner advise it if he determined "that any matter covered by this Agreement is a reportable transaction." Petitioner attempted to strike this sentence from the engagement letter, evidencing his active avoidance of learning the truth.

[*49] PwC advised petitioner orally that "a position can be taken" that the proposed stock sale would not be a reportable transaction. In tax-speak, this translates to a low level of confidence on PwC's part.[14] Petitioner's lawyers attempted to include in the stock purchase agreement a provision prohibiting West Side from engaging in a "listed transaction" after Fortrend acquired West Side. Fortrend refused to agree to this provision. Any reasonably diligent person would infer from this refusal that a "listed transaction" was very likely what Fortrend, a tax shelter promoter, had in mind.

Though alerted by these warning signs, petitioner and his advisers failed to conduct a diligent inquiry into the "high basis/low value" debt strategy that Fortrend proposed for eliminating West Side's tax liabilities. PwC had advised that this appeared to be "a very aggressive tax-motivated strategy" that was "subject to IRS challenge." PwC specifically declined to give "more likely than not" assurance on this point. Petitioner turned his back on this red flag. He testified that

---

[14]Under regulations in effect during 2003, "[a] position * * * [was] considered to have a realistic possibility of being sustained on its merits" if a well-informed tax professional would conclude that it had "approximately a one in three, or greater, likelihood of being sustained on its merits." Sec. 1.6694-2(b)(1), Income Tax Regs. Stating that "a position can be taken" suggests a lower level of confidence than this. Virtually any position "can be taken."

[*50] Fortrend's tax-elimination strategy was of no concern to him because "that was their business."

Mr. Purcell testified that petitioner could not have sought an opinion from PwC concerning Fortrend's bad debt strategy because, as of the closing date, Fortrend had put no specific high-basis/low-value plan on the table. The Court did not find this testimony persuasive. If ordinary diligence required petitioner and his advisers to investigate Fortrend's plan, as Mr. Purcell admitted, ordinary diligence required them to dig more deeply into what Fortrend's bad-debt strategy was. Fortrend obviously had to know, as of September 9, 2003, how it envisioned eliminating a $16.9 million corporate tax liability in fewer than 12 weeks. Reasonable diligence required petitioner and his advisers to insist that Fortrend explain its debt reduction strategy in sufficient detail to enable PwC to evaluate it.

Numerous other features of Fortrend's proposal raised red flags that demanded further inquiry. Fortrend offered to pay petitioner $11.2 million more than the net book value of West Side--representing a premium of 47%--while insisting that West Side's assets be reduced to cash. Petitioner was a sophisticated entrepreneur who had built a company and knew how to value a business. It should have provoked tremendous skepticism to discover that Fortrend was

[*51] willing to pay a 47% premium to acquire cash, which by definition cannot be worth more than its face value.

The business purpose alleged for the transaction, moreover, made absolutely no sense. Petitioner and his advisers were told that Fortrend intended to put West Side into the "distressed debt" business. "[T]he business purpose for the acquisition," according to PwC's memo, was "based on the new business' need for cash to purchase the charged-off credit card debt as commercial financing for such purposes is apparently difficult."

This explanation demanded further inquiry from any reasonably diligent person. In order to purchase West Side's stock, Fortrend needed to have cash or be able to borrow cash. If Fortrend had cash or could easily borrow cash, why would it want to acquire West Side in order to get cash? Moreover, as PwC noted in a parenthetical, "most of the $40,000,000 cash in Westside will be distributed out of Westside and used by * * * [Fortrend] to pay back the cash borrowed to purchase * * * [petitioner's] Westside stock." Since there was going to be precious little cash left in West Side after the deal closed, the "business purpose" alleged for the transaction did not pass the straight-face test.

The icing on the cake was the manner in which the purchase price was determined. Numerous spreadsheets prepared by petitioner's brother explicitly

**[*52]** state that the purchase price would equal West Side's closing cash balance

plus 68.125% of its accrued tax liabilities. A sophisticated businessman like

petitioner should have been curious as to why the purchase price for his company

was being computed as a percentage of its tax liabilities, and why this was the only

number that Fortrend seemed to care about. In effect, Fortrend was offering to

assume a $16.9 million tax liability in exchange for a $5 million fee. Because the

economics of the deal made it obvious that Fortrend was not going to pay West

Side's tax liabilities, this fact alone put petitioner on "inquiry knowledge."[15]

Petitioner testified that he had no contemporaneous understanding that the

"Fortrend premium" was correlated to West Side's accrued tax liabilities. The

Court did not find this testimony credible. Petitioner actively participated in nego-

---

[15]In the stock purchase agreement, Nob Hill represented that it would "cause
* * * [West Side] to satisfy fully all United States * * * taxes, penalties and inter-
est required to be paid by * * * [West Side]." This representation was not worth
the paper it was printed on. Petitioner and his advisers knew that Nob Hill was a
shell corporation, that West Side would have virtually no assets left after the clo-
sing, and that neither would have the wherewithal to pay a $16.9 million tax lia-
bility. And because Nob Hill and Millennium (its parent) were offshore com-
panies with no U.S. assets, this representation was completely unenforceable. The
language in the stock purchase agreement allocating West Side's 2003 tax obli-
gation to Nob Hill did not relieve petitioner of his duty to inquire. See Diebold
Found., Inc., 736 F.3d at 189 ("[T]he knowledge requirement for collapsing a
transaction was designed to 'protect[] innocent creditors or purchasers for value.'
* * * It was not designed to allow parties to shield themselves, when having
knowledge of the scheme, by simply using a stock agreement to disclaim any
responsibility." (quoting HBE Leasing Corp., 48 F.3d at 636)).

**[*53]** tiating Fortrend's fee. When confronted with his brother's spreadsheets that invariably compute Fortrend's fee as 31.875% of West Side's tax liabilities, petitioner became visibly uncomfortable. Petitioner's evasive testimony is further evidence that he had at least constructive knowledge that Fortrend planned to use a tax-avoidance scheme to eliminate West Side's tax liability.

To conclude that the totality of these circumstances did not give rise to constructive knowledge on petitioner's part "would do away with the distinction between actual and constructive knowledge." Diebold Found., Inc., 736 F.3d at 189. And to relieve petitioner and his advisers of the duty to inquire, when the surrounding circumstances cried out for such inquiry, "would be to bless the willful blindness the constructive knowledge test was designed to root out." Ibid. We find as a fact that petitioner had constructive knowledge that Fortrend intended to implement an illegitimate scheme to evade West Side's accrued tax liabilities and leave it without assets to satisfy those liabilities. The various steps of the Midco transaction may thus be "collapsed" in determining whether petitioner was a "transferee" of West Side under Ohio law.[16]

---

[16]As the Second Circuit explained in Diebold Found., Inc., "collapsing" the transactions in this way requires, not only that the ultimate transferee have "constructive knowledge of the entire scheme," but also that the debtor's property "be reconveyed * * * for less than fair consideration." 736 F.3d at 186. We address

(continued...)

[*54] The remaining question is whether these steps, once collapsed, yield a de facto "liquidation" of West Side from which petitioner received a $35.2 million liquidating distribution. Petitioner appears to believe that, for this to occur, there must have been a complete liquidation of West Side. We do not see the logic of this position: under state corporate law, as well as under Federal tax law, a corporation can be the subject of either a partial or a complete liquidation.[17] In either event, petitioner received a $35.2 million liquidating distribution upon surrendering his stock. We fail to see how it matters which kind of liquidation it was.

In any event, we find as a fact that West Side was in substance completely liquidated. There is no evidence that West Side conducted any bona fide business operations after September 10, 2003. It had no employees after that date. It reported no gross receipts, income, or business expenses relating to its supposed

---

[16](...continued)
the absence of "fair consideration" below in discussing the requirements of OUFTA section 1336.05. See infra pp. 58-59.

[17]See, e.g., sec. 302(b)(4)(B), (e) (defining "partial liquidation"); Armstrong v. Marathon Oil Co., 513 N.E.2d 776 (Ohio 1987) (noting that corporation was considering complete or partial liquidation to prevent hostile takeover); Cleveland Tr. Co. v. Hickox, 167 N.E. 592, 595-596 (Ohio Ct. App. 1929) ("If there is liquidation of a corporation, partial or complete, the determining element of the transaction is whether the stockholders surrender and cancel the stock which is given in exchange[.]"); 18B Am. Jur. 2d Corporations sec. 1064 (noting that shareholders' right to receive accumulated dividends on liquidation applies identically in partial and complete liquidations).

[*55] "debt collection" business. There is no evidence that it made any effort to collect the Aoyama loans or contracted with any third party to do so. Those loans were not operational assets of a business; they were simply tools for implementing a sham tax-avoidance scheme. In reality, West Side was nothing but a shell company immediately after the Midco deal closed.

At the insistence of petitioner's lawyers, West Side was kept in formal existence for several years. It filed tax returns; it cut checks to Fortrend affiliates; and it maintained a nominal cash balance. But keeping West Side in notional existence was simply a charade designed to create a defense to the precise argument the IRS is advancing here, an argument that petitioner and his attorneys knew the IRS would advance if this Midco transaction came to its attention. Such lawyerly stratagems cannot hide the fact that West Side had been liquidated in substance. It continued as a Potemkin village intended to deceive the IRS, just as the original was designed to fool Catherine the Great.

In sum, we find that petitioner had constructive knowledge of Fortrend's tax-avoidance scheme; that the multiple steps of the Midco transaction must be collapsed; and that collapsing these steps yields a partial or complete liquidation of West Side from which petitioner received in exchange for his stock a $35.2 million liquidating distribution. See Salus Mundi Found., 776 F.3d at 1019-1020

**[\*56]** (following the Second Circuit's analysis to the same effect in <u>Diebold Found., Inc.</u>). Under the OUFTA, petitioner is thus a direct transferee of West Side's assets under respondent's "de facto liquidation" theory as well as under the "sham loan" theory discussed previously.[18]

### 2. Petitioner's Liability Under Ohio Law as a "Transferee"

OUFTA section 1336.05(A) provides that a transfer is fraudulent with respect to a creditor where: (1) the creditor's claim arose before the transfer; (2) the transferor did not receive "a reasonably equivalent value in exchange for the transfer"; and (3) the transferor became insolvent as a result of the transfer. We find that all three of these elements are satisfied here. Petitioner is thus liable as a transferee of West Side under Ohio law.

### a. When the IRS Claim Arose

During April and May 2003, West Side received proceeds of $65 million from the PUCO settlement. This yielded a large gain that generated a tax liability of approximately $16.9 million. West Side thus had an accrued tax liability of

---

[18]Respondent advances the alternative contention that Nob Hill was a direct transferee of West Side and that petitioner has transferee-of-transferee liability as a subsequent transferee of Nob Hill. <u>See</u> sec. 6901(c)(2); <u>Frank Sawyer Trust of May 1992 v. Commissioner</u>, T.C. Memo. 2014-59 (finding transferee-of-transferee liability). Because we find that petitioner is liable as a direct transferee of West Side, we need not consider respondent's alternative position.

**[*57]** approximately $16.9 million before September 9, 2003, the day the Midco deal closed.

The OUFTA defines the term "claim" expansively to mean "a right to payment." Id. sec. 1336.01(C). A right to payment constitutes a claim regardless of whether it is "reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Ibid. A "creditor" is any person who has a "claim." Id. sec. 1336.01(D). Given this broad definition, transfers are fraudulent as to creditors whose claims have not been finally determined, and even as to creditors whose claims are not yet due. See Zahra Spiritual Tr. v. United States, 910 F.2d 240, 248 (5th Cir. 1990). Because "unmatured tax liabilities are taken into account in determining a debtor's solvency, they are 'claims' and should be treated as such under the expansive definition of the term 'claim'" in the UFTA. Stuart v. Commissioner, 144 T.C. __, __ (slip op. at 15) (Apr. 1, 2015).

Petitioner does not seriously dispute that the IRS had a "claim" against West Side before the stock sale. Rather, he argues that the IRS had no claim against Nob Hill when his stock was purchased because West Side had not yet transferred its cash into Nob Hill's Rabobank account. The precise timing of the back-to-back cash transfers is immaterial under our analysis. We have found that the various

[*58] transactions must be collapsed for purposes of determining the OUFTA's proper application. Because collapsing the transactions yields a transfer of cash from West Side to petitioner, it is irrelevant in what order the subsidiary transfers are thought to have occurred.

West Side's Federal tax liability had accrued by late May 2003. The IRS had a claim against West Side at that time. The transfer of West Side's assets to petitioner occurred on September 9, 2003. Respondent's claim thus "arose before the transfer was made." OUFTA sec. 1336.05(A).

b. "Reasonably Equivalent Value"

OUFTA section 1336.05(A) imposes, as a second condition of liability, that the debtor not have received "a reasonably equivalent value in exchange for the transfer." Whether the debtor received "reasonably equivalent value" is a question of fact. See Shockley v. Commissioner, T.C. Memo. 2015-113, at *50.

On September 9, 2003, West Side consisted of nothing but cash and tax liabilities. The value of petitioner's stock thus equaled West Side's net asset value, which was about $23.7 million (cash equivalents of $40.6 million minus accrued tax liabilities of $16.9 million). West Side transferred $35.2 million to petitioner in exchange for his shares. Since his shares were worth only $23.7 million, West

**[*59]** Side did not receive "a reasonably equivalent value in exchange for the transfer." OUFTA sec. 1336.05(A).

The only other thing West Side got at the closing was a representation from Nob Hill that it would "cause" West Side to pay its 2003 tax liabilities in full. As we have found previously, this representation was not worth the paper it was printed on. Nob Hill was a shell company, incorporated offshore, with no assets in the United States (or anywhere else). Nob Hill's parent, Millennium, was also a Cayman Islands company with no assets in the United States. Both were affiliates of a tax shelter promoter. The value of Nob Hill's promise was zero.

### c. West Side's Insolvency

OUFTA section 1336.05(A) imposes, as a third condition of liability, that the debtor making the transfer "was insolvent at that time or * * * became insolvent as a result of the transfer." Petitioner asserts that West Side was solvent when he received Nob Hill's cash because, at that moment, West Side had not yet transferred its cash to Nob Hill. Thus, West Side supposedly had assets in excess of its tax liabilities when the transfer to petitioner occurred.

As with petitioner's argument about when the IRS claim arose, the precise timing of the back-to-back cash transfers is immaterial under our analysis. We have found that the various transactions must be collapsed for purposes of deter-

[*60] mining the OUFTA's proper application. Because collapsing the transactions yields a transfer of cash from West Side to petitioner, West Side's solvency must be judged on that basis.

Under OUFTA sections 1336.02 and .05, solvency is measured at the time of the transfer. A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation. Id. sec. 1336.02(A)(1). Following the transfer of $35.2 million to petitioner, West Side was left with tax liabilities of $16.9 million and assets of $5.1 million (consisting of a Rabobank account soon to be emptied by payments to tax shelter promoters). West Side thus "became insolvent as a result of the transfer." Id. sec. 1336.05(A).

In sum, we find that the IRS claim arose before West Side's assets were transferred to petitioner; that West Side made this transfer without having received "a reasonably equivalent value in exchange"; and that this transfer caused West Side to become insolvent. Petitioner is thus liable for West Side's tax debts under OUFTA section 1336.05(A).[19]

---

[19]The result would be the same if the IRS' claim were thought to have arisen after West Side's assets were transferred to petitioner. OUFTA section 1336.04(A)(2) provides that a transfer is fraudulent with respect to a present or future creditor if the transfer was made without the debtor's receiving "a reasonably equivalent value in exchange" and if (among other things) the debtor "intended to incur, or believed or reasonably should have believed that he would

(continued...)

**[*61]**    3.    <u>Petitioner's Liability Under Ohio Law For Penalties</u>

Even if he can be held liable for West Side's unpaid tax, petitioner contends that the penalties assessed against West Side cannot be collected from him as its "transferee" under Ohio law. According to petitioner, "the distressed debt transaction giving rise to those penalties was not entered into until after petitioner sold his stock and petitioner had nothing whatsoever to do with that transaction." In support of this proposition he relies on <u>Stanko v. Commissioner</u>, 209 F.3d 1082 (8th Cir. 2000), <u>rev'g</u> T.C. Memo. 1996-530.

In <u>Stanko</u>, the Eighth Circuit interpreted Nebraska law in effect before 1989, when Nebraska adopted the UFTA. <u>See</u> <u>id.</u> at 1084 n.1. The Court reasoned that "penalties for negligent or intentional misconduct by the transferor that occurred many months after the transfer * * * are not * * * existing at the time of the transfer." <u>Id.</u> at 1088. The Eighth Circuit concluded that "[a] creditor whose debt did not exist at the date of the * * * [transfer] cannot have the conveyance

---

[19](...continued)

incur, debts beyond his ability to pay as they became due." As discussed in the text, West Side did not receive "a reasonably equivalent value in exchange" for its transfer to petitioner. And if the IRS claim were regarded as arising after, rather than before, this transfer, West Side knew that it would incur tax debts "beyond * * * [its] ability to pay as they became due." <u>Ibid.</u> In view of our disposition, however, we need not discuss in any detail petitioner's liability under this alternative provision. We likewise need not decide whether petitioner would be liable under the OUFTA's "actual fraud" provision.

[*62] declared fraudulent unless he pleads and proves that the conveyance was made to defraud subsequent creditors whose debts were in contemplation at the time." Id. at 1087 (quoting U.S. Nat'l Bank of Omaha v. Rupe, 296 N.W.2d 474, 476 (Neb. 1980)).

We find the Stanko case to have no application here. The instant case is governed by Ohio law, and the governing Ohio law differs from the pre-UFTA Nebraska statute that the Eighth Circuit was construing. The OUFTA defines "claim" expansively to include any "right to payment" even if it is "unliquidated" and "unmatured." OUFTA sec. 1336.01(C). The IRS may thus have a "claim" for the penalties whether or not they are thought to have been "existing at the time of the transfer." Stanko, 209 F.3d at 1088. The OUFTA, moreover, does not require proof that the transfer was made to defraud specific creditors; nor does it require proof that the debts in question "were in contemplation at the time" the assets were conveyed. Id. at 1087.

Finally, the OUFTA provides that a transfer may be held fraudulent as to future as well as present creditors. Liability as to future creditors exists if the transfer was made without the debtor's receiving "a reasonably equivalent value in exchange" and the debtor "intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became

[*63] due." OUFTA sec. 1336.04(A)(2)(b). Thus, even if respondent's claim for the penalties were regarded as not being "in existence" on the date of the transfer, petitioner would have transferee liability to the IRS under OUFTA section 1336.04(A)(2) in its capacity as a "future creditor" with respect to those penalties. See supra pp. 60-61 and note 19.

For these reasons, we conclude that petitioner is liable under Ohio law as a transferee both with respect to West Side's unpaid tax deficiency and with respect to the penalties properly assessed against it. We have reached the same conclusion concerning transferee liability for penalties under the fraudulent transfer laws of other States. See, e.g., Kreps v. Commissioner, 42 T.C. 660, 670 (1964) (New York law), aff'd, 351 F.2d 1 (2d Cir. 1965); Cullifer, T.C. Memo. 2014-208, at *30, *74 (Texas law); Feldman v. Commissioner, T.C. Memo. 2011-297, 102 T.C.M. (CCH) 613, 623 (Wisconsin law).[20]

---

[20]In Frank Sawyer Trust of May 1992 v. Commissioner, T.C. Memo. 2014-128, at *10-*11, this Court cited Stanko, 209 F.3d. at 1088, in holding that a transferee was not liable for accuracy-related penalties assessed against the transferors. The facts of the instant case, which must be evaluated under Ohio law, differ substantially from those of Frank Sawyer Trust, which involved Massachusetts law. The First Circuit accepted our "factual finding that the Trust lacked knowledge--actual or constructive--of the new shareholders' tax avoidance intentions." Frank Sawyer Trust of May 1992, 712 F.3d at 599. Here, we have found that petitioner had at least constructive knowledge that West Side's tax liabilities would not be satisfied.

**[*64]** B.     Petitioner's Status as a "Transferee" Under Federal Law

Whether a person is a "transferee" within the meaning of section 6901 is "undisputedly [a question] of federal law."  Starnes, 680 F.3d at 427; see Slone, __ F.3d __, 2015 WL 5061315; Feldman, 779 F.3d at 458.  "Transferee" is an expansive term that includes a "donee, heir, legatee, devisee, and distributee." Sec. 6901(h).  The term also includes "the shareholder of a dissolved corporation," "the successor of a corporation," and "the assignee * * * of an insolvent person." Sec. 301.6901-1(b), Proced. & Admin. Regs.

In determining "transferee" status for Federal law purposes, the Ninth Circuit has recently held that a court must consider whether to disregard the form of the transaction by which the transfer occurred.  See Slone, __ F.3d at __, 2015 WL 5061315, at *5.  "[F]or purposes of transferee liability under § 6901," the Ninth Circuit ruled, relevant precedent requires that the court "look through the form of a transaction to consider its substance."  Id. at __, 2015 WL 5061315, at *4.  Analyzing a transaction similar to that here, the Ninth Circuit explained in Slone:

> [W]hen the Commissioner claims a taxpayer was "the shareholder of
> a dissolved corporation" for purposes of 26 C.F.R. § 301.6901-1(b),
> but the taxpayer did not receive a liquidating distribution if the form
> of the transaction is respected, a court must consider the relevant
> subjective and objective factors to determine whether the formal
> transaction "had any practical economic effects other than the
> creation of income tax losses."

**[\*65]** Id. at __, 2015 WL 5061315, at \*5 (quoting Reddam v. Commissioner, 755 F.3d 1051, 1060 (9th Cir. 2014), aff'g T.C. Memo. 2012-106).[21]

In performing this "substance over form" inquiry, the Ninth Circuit does not engage in a rigid two-step analysis.  Rather, it focuses "holistically on whether the transaction had any practical economic effects other than the creation of income tax losses."  Id. (quoting Reddam, 755 F.3d at 1060).  Following a commonsense review of the transaction, if the court concludes that the transaction lacks a nontax business purpose, has no economic substance, and was entered into solely to generate illegitimate tax benefits, the Commissioner may disregard the form the parties have selected and tax the transaction on the basis of its underlying economic substance.  Id. at __, 2015 WL 5061315, at \*5-\*6.

For the reasons discussed previously, we find that the transaction by which Nob Hill "purchased" petitioner's West Side stock relied on sham transactions, had no economic substance, had no bona fide business purpose, and was entered into solely to evade West Side's Federal and Ohio tax liabilities.  See supra p. 40

---

[21]At least two other Circuits have previously ruled similarly.  See Feldman, 779 F.3d at 454-457 (7th Cir. 2015); Owens v. Commissioner, 568 F.2d 1233 (6th Cir. 1977) ("[T]he law does not permit a taxpayer \* \* \* to cast transactions in forms when there is no economic reality behind the use of the forms.  'The incidence of taxation depends on the substance of a transaction.'" (quoting Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945))), aff'g in part, rev'g in part, 64 T.C. 1 (1975).

[*66] and note 11 and pp. 41-55.  We therefore disregard the form of the transaction and find that petitioner in substance was a direct recipient of West Side's cash, i.e., as a "distributee," "the shareholder of a dissolved corporation," or "the assignee * * * of an insolvent person."  Sec. 6901(h); sec. 301.6901-1(b), Proced. & Admin. Regs.  In any of those capacities, he was a "transferee" of West Side within the meaning of section 6901.

IV.  Respondent's Collection Efforts

In certain circumstances the IRS may be required to show that it exhausted all reasonable efforts to collect the tax liability from the transferor before proceeding against the transferee.  See Sharp v. Commissioner, 35 T.C. 1168, 1175 (1961); Shockley v. Commissioner, T.C. Memo. 2015-113, at *54; Kardash v. Commissioner, T.C. Memo. 2015-51, at *22-*24; Zadorkin v. Commissioner, T.C. Memo. 1985-137, 49 T.C.M. (CCH) 1022, 1028 (1985).  The reasonableness of the IRS' collection efforts against the tax debtor must be assessed in the light of the facts of the particular case.  Where "the transferor is hopelessly insolvent, the creditor is not required to take useless steps to collect from the transferor." Zadorkin, 49 T.C.M. (CCH) at 1028.

In 2008, during the course of its examination of West Side, the IRS searched for any existing West Side assets upon which to levy.  Unsurprisingly, it

**[*67]** found none.  In 2008, as in late September 2003, West Side had no meaningful assets.  What little cash it had post closing was quickly dissipated by payments to Fortrend, MidCoast, and their tax shelter promoter affiliates.  Millennium, West Side's postclosing parent, was likewise immune from IRS collection efforts because it was a Cayman Islands company with no assets in the United States.  We find that the IRS acted completely reasonably in declining to take further, useless, steps to collect this liability from West Side.

Petitioner also argues that the IRS failed to make collection efforts against Moffatt, whose $5 million "loan" was allegedly repaid with some of West Side's cash.  We have already determined that the Moffatt loan was a sham.  In substance, West Side's cash went directly to petitioner, and the Moffatt "loan" was simply an overnight shuffling of funds between two Fortrend affiliates.  Under these circumstances, it is not certain that Moffatt was a transferee of West Side.

Even if Moffatt were thought to be a transferee of West Side, collection efforts against it would almost certainly have been futile.  As far as the trial revealed, Moffatt was a shadowy entity that appeared and quickly disappeared.  There is no evidence in the record about what assets Moffatt had or where they were.  It is a fair assumption that Fortrend established this affiliate, like Nob Hill,

**[\*68]** Millennium, and its other affiliates, in a manner that effectively immunized them from the reach of U.S. tax authorities.

In any event, the IRS is not required to pursue collection efforts against Transferee A before seeking to collect from Transferee B. "Transferee liability is several" under section 6901. Alexander v. Commissioner, 61 T.C. 278, 295 (1973); Cullifer v. Commissioner, T.C. Memo. 2014-208, at \*74 (same). "It is well settled that a transferee is severally liable for the unpaid tax of the transferor to the extent of the assets received and other stockholders or transferees need not be joined." Estate of Harrison v. Commissioner, 16 T.C. 727, 731 (1951) (citing Phillips v. Commissioner, 283 U.S. 589 (1931) (construing predecessor statute)). "In the event that one transferee is called upon to pay more than his pro rata share of the tax, he is left to his rights of contribution from the other transferees." Id. Petitioner is free to pursue against Moffat any right of contribution he may have.

We accordingly conclude (1) that petitioner is liable under Ohio law for the full amount of West Side's 2003 tax deficiency and the penalties and interest in connection therewith and (2) that the IRS may collect this aggregate liability from petitioner as a "transferee" under section 6901. See OUFTA sec. 1336.08(B); Shussel v. Werfel, 758 F.3d 82 (1st Cir. 2014) (discussing the calculation of

**[\*69]** prejudgment interest on transferee liability), <u>aff'g in part, rev'g in part and remanding</u> T.C. Memo. 2013-32.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.